Honorable Kymberly K. Evanson

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MATTHEW SMITH, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>F5, INC., FRANCOIS LOCOH-DONOU, EDWARD COOPER WERNER, KUNAL ANAND, and THOMAS DEAN FOUNTAIN,<br><br>Defendants. | NO. 2:25-cv-02619-KKE<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>DEMAND FOR JURY TRIAL</u> |



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

## TABLE OF CONTENTS


I. INTRODUCTION ..... 5

II. JURISDICTION AND VENUE ..... 14

III. PARTIES ..... 14

A. Lead Plaintiffs ..... 14

B. Defendants ..... 15

IV. BACKGROUND AND SUMMARY OF THE FRAUD ..... 21

A. F5's Business ..... 21

B. F5's Experience with and the Importance of Cybersecurity to F5's Business Prospects ..... 24

C. Before and During the Class Period, F5's Products, Including BIG-IP Were Prime Targets for Cybersecurity Attacks, Including by Nation-State Actors ..... 28

D. F5 Highlights Its Security Capabilities Throughout the Class Period ..... 30

E. Unknown to Investors, F5's Security Controls were Deficient Allowing a Threat Actor to Maintain Long-Term, Persistent Access to Critical F5 Systems ..... 32

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..... 43

A. False and Misleading Statements on the Company's Website ..... 43

B. False and Misleading Statements During F5's October 28, 2024 Q4 2024 Earnings Call ..... 47

C. False and Misleading Statements During the November 19, 2024 Needham Security, Networking, and Communications Conference ..... 49

D. False and Misleading Statements During the November 20, 2024 RBC Capital Markets Conference ..... 50

E. False and Misleading Statements During the December 10, 2024 Raymond James TMT Conference ..... 52

F. False and Misleading Statements in F5's 2024 Form 10-K and 2024 Annual Report ..... 53




TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

G. False and Misleading Statements During F5's January 28, 2025 Q1 2025 Earnings Call ........ 55

H. False and Misleading Statements During F5's April 28, 2025 Q2 2025 Earnings Call and in the Q2 2025 Earnings Release ........ 57

I. False and Misleading Statements During the May 14, 2025 JPMorgan Conference ........ 59

J. False and Misleading Statements During the June 4, 2025 Bank of America Global Technology Conference ........ 60

K. False and Misleading Statements During F5's July 30, 2025 Q3 2025 Earnings Call and Q3 2025 Earnings Release ........ 61

L. False and Misleading Statements During the September 9, 2025 Goldman Sachs Conference ........ 63

M. False and Misleading Statements in F5's September 11, 2025 Form 8-K ........ 66

VI. THE TRUTH IS REVEALED ........ 67

A. First Partial Corrective Disclosure – October 15, 2025 ........ 67

B. Second Partial Corrective Disclosure – October 27, 2025 ........ 72

VII. POST-CLASS PERIOD DEVELOPMENTS ........ 75

VIII. ADDITIONAL INDICIA OF DEFENDANTS' SCIENTER ........ 80

A. Cybersecurity and BIG-IP Were at the Core of F5's Operations ........ 80

B. The Nature, Duration, and Severity of the Breach are Provide Additional Indicia of Defendants' Scienter ........ 82

C. Defendants Knew About the Breach Before Disclosure and Chose to Make Affirmative Misrepresentations Rather Than Remain Silent ........ 85

D. Defendants' Self-Proclaimed Expertise and Repeated Assurances Regarding F5's Security Capabilities ........ 87

E. The Breach was Worse than Represented ........ 91

F. Defendants Were on Notice of Repeated Nation-State Targeting of BIG-IP ........ 93

G. The Company's Internally Deficient Security Culture ........ 94

IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ........ 95




TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

X. PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE .......... 96
XI. LOSS CAUSATION / ECONOMIC LOSS .......... 97
XII. CLASS ACTION ALLEGATIONS .......... 99
COUNT I .......... 101
COUNT II .......... 103
XIII. PRAYER FOR RELIEF .......... 104
XIV. JURY DEMAND .......... 105



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

Lead Plaintiffs Stichting Bedrijfspensioenfonds voor het Bakkersbedrijf ("Bakkers") and Stichting Bedrijfstakpensioenfonds voor de Zoetwarenindustrie ("Zoetwaren") (together, "Lead Plaintiffs") individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based upon, *inter alia*, their counsel's and their independent investigation.[1]

## I. INTRODUCTION

1. Lead Plaintiffs bring this action against Defendants[2] for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, on behalf of themselves and all other similarly situated persons or entities (the "Class") who purchased or otherwise acquired the publicly traded common stock of F5 between October 28, 2024 and October 27, 2025, inclusive (the "Class Period").

2. F5 is a Seattle-based application delivery and security company. Its flagship product, BIG-IP, is a technology platform that sits at the front edge of corporate networks providing critical security functions, load balancing, and traffic management for applications. The Company's products, including BIG-IP, are widely used, including by some of the world's largest banks, automobile manufacturers, and telecommunications providers, along with the United States federal government. Because F5's products occupy a uniquely sensitive position

---

[1] This investigation included, but was not limited to, a review and analysis of: (i) F5's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) transcripts of F5's public conference calls and presentations; (iii) F5's press releases and media, and research reports regarding F5; (iv) pricing and volume data for F5's common stock; (v) interviews with former F5 employees who were at the Company during the Class Period; (vi) a forensic analysis of F5's cybersecurity posture and breach response; (vii) consultation with cybersecurity experts; and (viii) other publicly available material and data identified herein. Counsel's investigation is ongoing, and many of the facts supporting the allegations contained herein are known only to the Defendants named herein or are exclusively within their custody and control. Lead Plaintiffs believe additional evidentiary support exists for the allegations set forth herein and will be confirmed after a reasonable opportunity for discovery.

[2] Defendants are F5, François Locoh-Donou ("Locoh-Donou"), Edward Cooper Werner ("Werner"), Kunal Anand ("Anand"), and Thomas Dean Fountain ("Fountain").



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

inside customer networks, F5's customers must trust that F5 itself maintains robust and effective cybersecurity controls.

3. Throughout the Class Period Defendants knew that sophisticated nation-state actors, including China-nexus groups, were actively targeting BIG-IP and other F5 products. Against that backdrop, Defendants assured investors over and over that F5 was a singular cybersecurity leader. On October 28, 2024, the first day of the Class Period, Defendant Locoh-Donou told investors that F5 "***over the last two decades, has really mastered the expertise of securing and delivering***" ***critical*** "***network and application traffic***," adding that F5 "bring[s] ***consistent industry-leading security***." Defendants assured investors that F5 "deliver[ed] the most effective and comprehensive application and API [Application Programming Interface] security platform in the industry," that F5 "***stand[s] alone*** with the only complete hybrid multi-cloud portfolio for application security and delivery," and that F5 was the "***only player*** that can partner with a CIO or CISO [Chief Information Security Officer] ***to secure and deliver all of their applications and APIs***."

4. F5 reinforced these and similar statements across every channel it controlled. F5 assured investors that its "solutions ensure applications worldwide are performant and secure" and "F5 empowers our customers to establish a consistent security posture across all their applications, enhancing security." F5 described itself to investors as "Providing customers the industry's premier platform" that was "Built to put control without compromise into customers' hands, ***with fewer blind spots and stronger defenses*** for better business outcomes." F5 told investors that its comprehensive cybersecurity capabilities were a significant part of its value proposition, one of the ways it differentiated itself, and gave the Company a "competitive advantage."

5. F5's SEC filings carried the same message to investors. Defendants represented that the Company's cybersecurity risk program was led by its Chief Information Security Officer ("CISO") and included "protocols for preventing, monitoring, detecting and responding to



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

cybersecurity events and incidents," including "regular testing and assessments to identify vulnerabilities." The Company's disclosures in its 2025 Proxy Statement further represented that management identified potential cybersecurity risks and threats and discussed them with the Board's Risk Committee on a quarterly basis, and that F5's CISO provided periodic updates to the Risk Committee on cybersecurity-related topics, "including cyber threats to the Company and the status of the Company's cybersecurity posture and risk mitigation efforts."

6. F5's public-facing communications told a similar story. The Company's website positioned F5 as a cybersecurity leader, stating that F5 "obsess[es] over … attack methods," "dissect[s] exploits," and provides "the intel you need to stay informed so your apps can stay safe." F5's website also stated its products ensured "an ultra-secure environment" extending "critical zero trust security capabilities to every strategic point in your infrastructure,"[3] and that F5's web app and API protection could "inspect every request, enforce security policies, and mitigate threats across hybrid multicloud environments." F5 even maintained and promoted a dedicated research arm, "F5 Labs," which published cybersecurity threat intelligence under the tagline "Threat research. Security leadership. Decades of experience."

7. Those statements were false and misleading when made. As F5 itself would later admit, F5's controls were "uneven—strong in some places and not in others." That admission was not a minor concession. It was a description of a Company whose internal cybersecurity was so deficient that, while Defendants were telling investors that F5 had "mastered the expertise of securing" critical traffic, a nation-state threat actor had already penetrated F5's corporate network in late 2023 and was moving through the Company's most sensitive systems without being detected. The intruder maintained long-term, persistent access to F5's BIG-IP product development environment and engineering knowledge management platform, exfiltrating BIG-IP source code and information regarding undisclosed BIG-IP vulnerabilities that F5 was actively

---

[3] Zero trust is a cybersecurity framework based on the principle that no user, device, or system should be automatically trusted, even if it is inside an organization's network, and that every access request must be continuously verified before being granted.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

working to repair (the "Security Breach" or "Breach"). The intrusion would persist, undetected by F5, for approximately two years.

8. F5 purportedly detected the Breach on August 9, 2025. Defendants did not disclose the intrusion, however, and chose instead to double down on their assurances that F5 had best-in-class cybersecurity capabilities. On September 9, 2025, with a month of internal knowledge of the active nation-state intrusion, Defendants Locoh-Donou and Werner attended the Goldman Sachs Communacopia & Technology Conference and assured investors that F5 "control[s] 100% of the traffic going into mission-critical applications" and that F5 was "absolutely critical to all application security." Two days later, on September 11, 2025, F5 issued a press release promoting itself as "the global leader that delivers and secures every app" and the Company that, "[b]acked by three decades of expertise," had "built the industry's premier platform—F5 Application Delivery and Security Platform (ADSP)—to deliver and secure every app, every API, anywhere: on-premises, in the cloud, at the edge, and across hybrid, multicloud environments." Defendants said nothing about the Breach.

9. The truth began to emerge on October 15, 2025, when F5 disclosed in a Form 8-K that a "highly sophisticated nation-state threat actor" had maintained "long-term, persistent access to, and downloaded files from, certain F5 systems," including the BIG-IP product development environment and engineering knowledge management platform. F5 acknowledged that the exfiltrated files contained "certain portions of the Company's BIG-IP source code and information about undisclosed vulnerabilities that it was working on in BIG-IP," and that "some of the exfiltrated files from our knowledge management platform contained configuration or implementation information" for certain customers.

10. The same Form 8-K disclosed a separate, telling fact. Effective October 9, 2025 (six days before the Breach was made public), F5 Board member Michael Montoya resigned from F5's Board of Directors, including from his seat on the Risk Committee, and was immediately appointed to a newly created C-suite position. Reporting directly to Defendant



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

Locoh-Donou, Montoya was tasked with leading "the enterprise-wide strategy and execution to build and operate the Company with security at its core." A Company that had told investors throughout the Class Period that it had "mastered" cybersecurity does not, in the ordinary course, move a sitting Risk Committee director into a brand-new senior executive role to "build" security into the Company "at its core."

11. The Breach did not result from the overwhelming sophistication of the attacker. It happened because, contrary to the picture Defendants painted, F5's own cybersecurity controls were deficient and had been for years. A forensic investigation has revealed that a digital warehouse for the BIG-IP build pipeline was publicly reachable and exposed to the internet for over five years, including during the Class Period, contrary to industry standards and best practices. F5 failed to properly restrict application access or segment its development environment from its production environment, so that an attacker who reached one part of the system could move to others without encountering meaningful security barriers. Internal systems used default or trivially guessable passwords, and at least four sets of credentials to core development systems circulated on the dark web between 2022 and 2025.

12. F5 had not even followed its own rules. The Company later admitted that its own "configuration guidance" specifies "that management interfaces should never be exposed to the public Internet and should always be protected through proper segmentation, network isolation, and access control." Yest, F5 broke that basic rule. *Bloomberg* reported that the attackers penetrated F5 by exploiting software from the Company "that had been left vulnerable and exposed to the internet," and that F5 told its own customers that the hackers were able to break in "after the firm's staff failed to follow the cybersecurity guidelines it provides customers." The Company that sold cybersecurity to the world's most sensitive enterprises was not following the very advice it gave them.

13. Nor did F5 discover the Breach on its own. F5 eventually learned of the intrusion from questions posed by the FBI. And by then, the nation-state actor had already been inside F5's



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

most sensitive systems for nearly two years. As a result, Defendants knew or should have known that their statements concerning, e.g., "protocols for preventing, monitoring, detecting and responding to cybersecurity events and incidents" that F5 had repeatedly highlighted in its SEC filings, and the "regular testing and assessments to identify vulnerabilities" the Company had publicly claimed to maintain, were false and misleading.

14. F5's October 15 disclosure prompted an immediate and pointed response from the federal government. The Cybersecurity and Infrastructure Security Agency ("CISA") issued Emergency Directive ED 26-01, ordering all U.S. federal civilian agencies to inventory their F5 BIG-IP devices, apply vendor-issued patches on accelerated timelines, disconnect any unsupported F5 devices, and harden all public-facing F5 systems. CISA described the Breach as presenting "an imminent threat to federal networks using F5 devices and software," and warned that exploitation "could potentially lead to a full compromise of target information systems." CISA's Acting Director stated that "[t]he alarming ease with which these vulnerabilities can be exploited by malicious actors demands immediate and decisive action," and that the same risks extended to any organization using F5's technology, "potentially leading to a ***catastrophic compromise of critical information systems***."

15. The reaction from cybersecurity experts and analysts was equally severe. Tenable's Chief Security Officer called the Breach "***a five-alarm fire for national security***," explaining that BIG-IP "isn't just another piece of software, but a foundational technology used to secure everything from government agencies to critical infrastructure" and that "[i]n the hands of a hostile actor, this stolen data is a master key that could be used to launch devastating attacks." Several cybersecurity executives and analysts compared the Breach to the SolarWinds intrusion. Zscaler concluded that "[t]he scale of this breach—encompassing stolen source code, internal vulnerability documentation, and customer configurations—transformed it from a corporate intrusion into an issue of national security."



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

16. In response to these revelations, F5's common stock collapsed. F5's common stock price fell from $343.17 on October 14, 2025 to $330.75 on October 15, 2025, and continued to fall to $295.35 on October 16, 2025, a two-day decline of approximately 13.9%, or $47.82 per share.

17. The disclosures that followed exposed the gulf between F5's assurances to investors and the reality inside its own systems. On October 22, 2025, F5's Chief Information Security Officer Christopher Burger published a post on the Company's website titled "Lessons we are learning from our security incident." F5 took "full ownership of" what it now called a "major security incident," and admitted, in its own words: "***Our controls were uneven***." That admission directly contradicted Defendants' Class Period assurances that F5 had "mastered the expertise of securing" critical traffic, delivered "consistent industry-leading security," and operated the "industry's premier platform" "with fewer blind spots and stronger defenses."

18. The remedial measures F5 announced alongside its admissions tell more of the story. Following the Breach, Defendants admitted that F5 had inadequate "automation in [its] inventory and patch management," insufficient "monitoring for detection and response," deficient "zero-trust capabilities across [its] infrastructure and operations," and lacked "advanced endpoint visibility [for] F5 BIG-IP." These foundational cybersecurity measures are precisely the kind of controls that a company telling investors it maintained "protocols for preventing, monitoring, detecting and responding to cybersecurity events," that ran "regular testing and assessments to identify vulnerabilities," and that operated the industry's "premier platform" would already have had in place. Yet, F5 was rolling them out only after a nation-state actor sat undetected in its core development systems for roughly two years.

19. After the market closed on October 27, 2025, F5 issued its Q4 2025 earnings release and disclosed the impact of the Breach on the Company's business. F5 cut its fiscal year 2026 revenue growth guidance and lowered Q1 fiscal year 2026 revenue to a range of $730



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

million to $780 million (below the prior consensus $794 million estimate) and non-GAAP earnings per share of $3.35 to $3.85 (well below the prior market estimate of $4.04).

20. On the accompanying earnings call, Defendant Locoh-Donou outlined three categories of harm flowing from the Breach: (1) diversion of F5's own field and sales resources from normal selling activities to customer remediation and breach response, (2) delayed client decisions as customers exercised heightened caution over new projects, and (3) outright project deferrals and cancellations. Locoh-Donou also confirmed that the Breach had affected both the software and hardware of BIG-IP, not merely a limited software environment.

21. In the wake of these further revelations, F5's common stock price fell from $290.41 on October 27, 2025 to $267.58 on October 28, 2025, and further to $258.76 on October 29, 2025, a two-day decline of approximately 10.9%. Across both corrective disclosure events, F5's common stock declined a total of $79.47 per share, or approximately 23%.

22. Post-breach commentary from financial publications and industry participants was swift and severe. *Seeking Alpha* deemed the reputational damage "lasting and structural," noting that reputation was "literally … the most important attribute for a cybersecurity company." Rapid7 warned that the compromise of F5's internal development systems represented a "long-tail risk," and that "[a]dversaries with access to proprietary source code or vulnerability research may attempt to identify latent weakness[es] in future operations." And Ars Technica reported that access to F5's source code, customer configurations, and unpatched vulnerability documentation had the potential to enable "unprecedented" supply-chain attacks against "thousands" of sensitive networks. Observers stated that "[t]he math is brutal," noting that when a vendor that touches roughly 85% of the Fortune 500 is breached, "the cascading risk doesn't just affect one company—it potentially exposes entire supply chains."

23. The dwell-time disparity between F5 and its peers was a particular focus of industry criticism. A technical analysis of the incident concluded: "For a vendor whose products sit at the security perimeter of thousands of enterprises" ***a "dwell time" of "two years" is***



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

***"staggering***." The same analysis noted that when peers experienced comparable intrusions, the "dwell time was measured in days, not years," and that "[t]he difference isn't luck. It's a fundamental difference in security culture, tooling, and operational maturity."

24. The market reacted accordingly. Following F5's October 27 guidance cut, Needham downgraded the stock on the "security breach" and "deal push-outs," Morningstar cut its fair value due to reputational damage and sales slowdowns consistent with prior breach cases, and Wolfe Research lamented that F5 was "Stealing Defeat from the Jaws of Victory," outlining a worst-case scenario of source-code-enabled exploitation.

25. Yet, those disclosures understated the problem. On March 27, 2026, F5 reclassified the vulnerability tied to the Breach from a denial-of-service flaw (severity rating of 7.5) to a ***critical-severity*** remote code execution vulnerability (severity rating of 9.8). One publication described the reclassification as moving the issue from "a minor technical glitch" to "a major threat."

26. F5's October 2025 disclosures combined with the post-Breach commentary from financial publications and industry participants revealed that Defendants' statements highlighting the Company's cybersecurity capabilities, including that F5 "mastered" the expertise of securing critical network and application traffic, had the "intel" for clients to stay informed and keep their technology safe, and that F5 created an "ultra-secure environment" which extended critical zero-trust security capabilities to every point of a client's infrastructure, were false and misleading when made and omitted material information F5 was required to disclose. As a result of Defendants' false and misleading statements made during the Class Period, Lead Plaintiffs and other members of the Class purchased or otherwise acquired F5 common stock at artificially inflated prices and suffered damages when the price declined in response to the partial disclosures. *See* Sections VI and XI.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

## II. JURISDICTION AND VENUE

27. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (*see* 17 C.F.R. §240.10b-5).

28. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

29. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa). The Company's principal offices are located in this District. Substantial acts in the furtherance of the alleged fraud or the effects of the fraud have occurred in this District. Defendants' wrongful acts also arose in, emanated from, and caused harm in this District. Such acts include the dissemination of false and misleading statements into this District. Additionally, venue is proper in light of the purchase of the Company's stock by members of the Class who reside in this District.

30. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, the United States mail, interstate telephone communications, and the facilities of a national securities exchange, the NASDAQ.

## III. PARTIES

### A. Lead Plaintiffs

31. Lead Plaintiffs Bakkers and Zoetwaren are pension funds representing the retirement savings of workers in the bakery and confectionery industries. As set forth in their certification (ECF No. 7-2), Lead Plaintiffs purchased F5 common stock on the NASDAQ during the Class Period at artificially inflated prices and were damaged by Defendants' violations of the federal securities laws alleged herein.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

**B. Defendants**

32. F5, Inc. is a Washington corporation with its principal executive offices located at 801 5th Avenue, Seattle, Washington 98104. During the Class Period, the Company's common stock traded on the NASDAQ under the symbol "FFIV."

33. Defendant François Locoh-Donou has served as the President, Chief Executive Officer ("CEO"), and a Director of F5 since April 2017. He was appointed Chairman of the Board effective March 2026.

(a) As CEO of F5, Locoh-Donou was the senior-most officer of the Company, with ultimate responsibility for the Company's performance and operations and for communicating with the Board. Locoh-Donou also had approval over and was a signatory to F5's SEC reporting, submitted certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") affirming the accuracy of the financial statements and adequacy of the Company's internal financial controls[4], and communicated directly with shareholders and market analysts through the Company's earnings calls and other market-related events.

(b) As CEO and a member of the Board, Locoh-Donou was responsible for directing F5's global operations, strategic business development, public statements, and financial affairs. The Company's proxy statements describe Locoh-Donou as having a "27-year background in enterprise technology," highlighting his "extensive executive experience spanning the security, networking, and telecommunications industries," and crediting him with leading "the transformation of the company from a hardware-centric ADC vendor, into a leader in Multi-Cloud Application Delivery and Security." Prior to joining F5, Locoh-Donou served as Chief Operating Officer at global networking solutions provider Ciena Corporation from November 2015 to January 2017, and as Senior Vice President, Global Products Group at Ciena from August 2011 to October 2015. During his more than 15 years at Ciena, Locoh-Donou held several

---

[4] Throughout the Class Period, Locoh-Donou signed SOX Section 302 and Section 906 certifications in connection with F5's quarterly reports filed with the SEC on Form 10-Q, including those filed on February 7, 2025, May 6, 2025, and August 6, 2025, as well as the Company's Form 10-K filed on November 18, 2024.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

additional leadership positions, including Vice President and General Manager, Europe, Middle East and Africa, from June 2005 to August 2011. When announcing his appointment as CEO of F5, the Company highlighted that Locoh-Donou would "bring to the Board intimate knowledge of the Company's strategic development, product management, and global operations." Further, F5 added that Locoh-Donou "has a broad understanding of the operational issues that face public companies such as [F5], and as [F5]'s new CEO, he will be a critical bridge between everyday Company, industry, and investor matters and the Board."

(c) Locoh-Donou repeatedly held himself out as knowledgeable about, and at no time during the Class Period did Locoh-Donou assert that he was not aware of F5's cybersecurity posture and capabilities. These statements reflect Locoh-Donou's direct, personal involvement in and awareness of cybersecurity matters at F5. Given his background and particular expertise, Locoh-Donou was uniquely positioned to know that his and F5's statements, Section V, were false and/or misleading when made.

34. Defendant Edward Cooper Werner has served as F5's Executive Vice President and Chief Financial Officer ("CFO") since November 2024. Werner joined the Company in 2001. Prior to his appointment as CFO, Werner served as F5's Senior Vice President, Finance since 2012 and before that as Vice President, Finance starting in 2008. Werner's long tenure at F5 gave him extensive institutional knowledge of the Company's operations, internal controls, and financial reporting.

(a) As the Company's CFO, Werner was F5's senior-most financial officer, responsible for overseeing F5's worldwide financial planning, analysis, accounting, reporting, and internal auditing procedures, as well as investor relations. Werner also signed F5's SEC reporting, submitted SOX certifications affirming the accuracy of the financial statements and adequacy of the Company's internal financial controls,[5] and communicated directly with

[5] Specifically, during the Class Period, Werner signed SOX Section 302 and Section 906 certifications in connection with F5's quarterly reports filed with the SEC on Form 10-Q, including those filed on February 7, 2025, May 6, 2025, and August 6, 2025.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

shareholders and market analysts through the Company's earnings calls and other market-related events.

(b) During conference calls with analysts and investors, Werner repeatedly held himself out as knowledgeable about, and at no time during the Class Period did Werner assert that he was not aware of F5's cybersecurity posture and ability to provide comprehensive security solutions. *See* Section VIII.D below. Given his background and particular expertise, including over 20 years at F5, Werner was positioned to know that his and F5's statements, Section V, below, were false and/or misleading when made.

35. Defendant Kunal Anand ("Anand") has held multiple technological leadership roles at F5 since joining the Company in April 2024. Anand initially joined F5 as Executive Vice President and Chief Technology Officer in April 2024. In September 2024 he was appointed Chief Technology and AI Officer, expanding his responsibilities to include F5's company-wide AI strategy. In October 2025 he was appointed to his current position as Executive Vice President and Chief Product Officer ("CPO").

(a) As the Company's Chief Technology and AI Officer, Anand charted the Company's technology and AI strategy and vision. Critically, Anand's background is steeped in cybersecurity. Prior to joining F5, Anand held the dual role of Chief Technology Officer and CISO at Imperva, a cybersecurity company. His path to Imperva began in 2018 with the acquisition of Prevoty, an application security startup he co-founded in 2013. Before founding Prevoty, Anand served as Director of Technology at BBC Worldwide. According to the Company's website, Anand "has a deep history of innovation and technical expertise, and has held roles leading security, data, technology, and engineering teams at Gravity, MySpace, and the NASA Jet Propulsion Lab," adding that Anand has "over 15 years of experience in AI and machine learning, ranging from model training, employing AI-driven algorithms to enhance products, and designing and implementing AI architectures." As the Company's CPO, Anand is



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

responsible for product vision, strategy, and execution to ensure development of breakthrough solutions that solve critical challenges and create exceptional experiences for customers.

(b) The Company has promoted Anand's qualifications and expertise to serve in his roles at F5. When announcing Anand's hire in April 2024, the Company stated he "joins the company with deep expertise across multiple areas, ***including cybersecurity and data, and will help accelerate F5's leadership in securing every app, everywhere-including in API security, the most critical aspect of AI security***. Most recently, Anand held the dual roles of CTO and Chief Information Security Officer (CISO) at Imperva." In announcing Anand's expanded role, the Company and Locoh-Donou stated that "it was clear that Kunal had both the experience and perspective required for the role. Through his prior experience leading the technical and security teams at Imperva, Kunal brings deep domain expertise and technical knowledge across cloud, security, networking, SaaS and AI." Indeed, the Company's SEC filings continue to highlight Anand's security expertise gained through past roles. For example, the Company's 2024 annual report highlights Anand's "deep history of innovation and technical expertise" gained through his "roles leading security, data, technology, and engineering teams at Gravity, MySpace, and the NASA Jet Propulsion Lab." At investor conferences, Anand repeatedly demonstrated his deep familiarity with cybersecurity matters. *See* Section VIII.D below. Given his background and particular expertise, Anand was positioned to know that his and F5's statements, Section V, below, were false and/or misleading.

36. Defendant Thomas Dean Fountain has served as F5's Executive Vice President and Chief Operating Officer ("COO") since September 2024. Prior to his role as COO, Fountain served as the Company's Executive Vice President of Global Services and Chief Strategy Officer from June 2020 through August 2024. Fountain first joined F5 in January 2018 as Executive Vice President and Chief Strategy Officer. Fountain thus served in progressively senior executive roles at F5 for over eight years during which he gained extensive knowledge of the Company's operations, products, and strategic direction.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

(a) As the Company's COO, Fountain was responsible for overseeing F5's global services organization. Fountain is also responsible for leading the Company's digital transformation to accelerate critical solution delivery to customers and for driving execution, productivity and efficiency company wide.

(b) The Company has highlighted Fountain's background in technology strategy, networking, and security-related businesses. F5 stated that from November 2012 to January 2018, Fountain served in senior strategy roles at McAfee and Intel, including Senior Vice President for Strategy and Corporate Development at McAfee and Vice President of Strategy and Operations at Intel. Prior to those roles, Fountain served at Juniper Networks as Vice President and General Manager of the Content and Media Business Unit from December 2011 to November 2012 and as Vice President of Corporate Strategy from February 2009 to December 2011. Earlier in his career, Fountain was a venture capitalist at Mayfield Fund from June 2003 to February 2009 and was co-founder and engineering leader at Ingrian Networks, a network security firm from December 1999 to June 2004. Fountain earned a B.S. in computer systems engineering, M.S. degrees in electrical engineering and computer science, and an M.B.A. from Stanford University. Fountain has decades of experience across networking, cybersecurity, technology strategy, and related enterprise-technology businesses.

(c) Further, during conference calls with analysts and investors, Fountain repeatedly held himself out as knowledgeable about, and at no time during the Class Period did Fountain assert that he was not aware of F5's cybersecurity posture. *See* Section VIII.D below. Given his background and particular expertise, Fountain was uniquely positioned to know that his and F5's statements, Section V, below, were false and/or misleading.

37. Defendants Locoh-Donou, Werner, Anand, and Fountain are referred to as the "Individual Defendants." The Individual Defendants and the Company are collectively referred to as "Defendants."



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

38. Each of the Individual Defendants, because of his respective senior position within the Company, possessed the power and authority to control the contents of F5's quarterly and annual reports, shareholder letters, releases, and / or presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each of the Individual Defendants was provided with copies of the Company's financial reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Throughout the Class Period, each of the Individual Defendants, as senior executive officers of F5: (i) was directly involved in the management and day-to-day operations of the Company at the highest levels; (ii) was privy to confidential and proprietary information concerning F5 and was involved in drafting, producing, reviewing, and disseminating the false and misleading statements and information alleged herein; (iii) was aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company; and (iv) approved or ratified these statements, in violation of the federal securities laws.

39. Each of the Individual Defendants had access to material non-public information about the Company and its current business, operations, services, competition, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board meetings, and via reports and other information provided to them in connection therewith. Because of their positions with the Company and their access to material non-public information that was available to them but not to the public, the Individual Defendants knew of and participated in the fraudulent scheme alleged herein, knew and/or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and knew and/or recklessly disregarded that the affirmative representations being made were then materially false and misleading.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

40. As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's operations, business, services, markets, competition, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and complete information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

41. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the contents of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be false and/or misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## IV. BACKGROUND AND SUMMARY OF THE FRAUD

### A. F5's Business

42. F5 is a technology company headquartered in Seattle, Washington. F5 develops and sells products and services that help businesses, government agencies, and other organizations deliver, protect, and manage their software applications across company-owned data centers, public cloud platforms, and edge networks. F5 sells its products and services to



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

customers in many industries, including technology, telecommunications, financial services, government, transportation, education, manufacturing, and health care.

43. F5's products sit at very sensitive points of its customers' computer networks. F5 sells "application delivery and security" technology, software and hardware that manages and directs traffic to applications, ensures applications are fast and available, and inspects, filters, and blocks malicious traffic before it can reach the customer's applications, databases, and application programming interfaces ("API").

44. The Company's core offerings include advanced load balancing, traffic management, and application security solutions designed to optimize user experiences and protect against threats such as distributed denial-of-service ("DDoS") attacks and web application exploits.[6] The Company markets itself as "the global leader that delivers and secures every app," and emphasizes that it is "committed to innovating and partnering with the world's largest and most advanced organizations to deliver fast, available, and secure digital experiences."

45. In other words, F5 helps keep its customers' systems running smoothly and securely. F5 acts as an intelligent "front door" by sitting between users and applications, intercepting, inspecting, and managing all incoming traffic before it reaches backend servers.

46. F5's product portfolio is organized around three primary product families: (i) F5 BIG-IP, a family of "application delivery controllers" ("ADCs"), devices and software that act as a gatekeeper between users on the internet and a customer's applications, performing functions such as load balancing (distributing user traffic across multiple servers so applications stay fast and available), web application firewalling (blocking malicious requests), encryption and decryption, identity and access management, and application access control; (ii) F5 NGINX, software used to deliver and secure modern, container-based applications and APIs; and (iii) F5

[6] A distributed denial-of-service ("DDoS") attack is a cyberattack in which multiple compromised computers or devices flood a website or network with excessive traffic, overwhelming the system and disrupting access for legitimate users.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

Distributed Cloud Services, a portfolio of cloud-based services for securing and delivering applications across hybrid multi-cloud environments. F5 packages these products under what it calls the "F5 Application Delivery and Security Platform" or "ADSP."

47. BIG-IP is F5's flagship product family, and by the Company's own description, an "integral part of many large organizations' IT systems." The foundational component for BIG-IP is F5's proprietary Traffic Management Operating System ("TMOS"). TMOS is a software platform designed specifically to inspect network and application traffic and make real-time, intelligent routing decisions based on F5's customers' configurations.

48. BIG-IP is used by approximately 48 of the world's top 50 corporations, and more than 80% of the Fortune Global 500 rely on F5. Furthermore, F5 supports more than 23,000 enterprise customers in over 170 countries, including the largest banks, automobile manufacturers, and telecommunications providers in the world. F5's customer base also includes the federal government, including the Departments of Agriculture, Justice, Homeland Security, and Veterans Affairs, as well as the Marine Corps, the Naval Surface Warfare Center, and others. F5 has stated that its products are used in all 15 U.S. presidential cabinet executive agencies. As Defendants told investors on October 27, 2025, BIG-IP is F5's highest revenue product.

49. Because BIG-IP sits at the network edge and inspects all traffic flowing into critical applications, the integrity of its source code, configuration data, and vulnerability information is critical to the security of F5's customers. Security researchers and government agencies have likened BIG-IP and similar perimeter-security products to the keys to the kingdom: an attacker with knowledge of how those products work and of vulnerabilities yet to be patched[7] can move laterally through customer networks, exfiltrate data, harvest credentials, and establish persistent access to the most sensitive parts of those networks. For example, after the Security Breach, Tenable's Chief Security Officer stated "[T]his isn't just another piece of software, but

[7] A "patch" is an update that modifies an existing product to fix bugs, close security vulnerabilities, or otherwise improve how the product works.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

a foundational technology used to secure everything from government agencies to critical infrastructure.[8] In the hands of a hostile actor, ***this stolen data is a master key that could be used to launch devastating attacks***." Ars Technica reported that "[c]ustomers position BIG-IP at the very edge of their networks for use as load balancers and firewalls, and for inspection and encryption of data passing into and out of networks. Given BIG-IP's network position and its role in managing traffic for web servers, ***previous compromises have allowed adversaries to expand their access to other parts of an infected network***." Similarly, following the Breach, Findings.co stated: "The math is brutal. F5 serves ~85% of the Fortune 500. When a vendor with that kind of penetration gets breached, the cascading risk doesn't just affect one company-it potentially exposes entire supply chains."[9]

### B. F5's Experience with and the Importance of Cybersecurity to F5's Business Prospects

50. F5 was incorporated in 1996, initially focused on solving a critical infrastructure challenge: optimizing data traffic management and ensuring the reliability of web applications. In the late 1990s and early 2000s, F5 introduced its flagship BIG-IP product line, used for traffic management, load balancing, and maintaining application performance. F5 also developed its proprietary iRules scripting language, which allowed organizations to customize traffic management policies to their unique environments. F5 went public on the NASDAQ in 1999. As businesses moved online and the dot-com boom accelerated technology investments, F5's solutions were adopted by major enterprises, financial institutions, and service providers.

51. As cyber threats grew in both number and sophistication through the 2000s and 2010s, the line between application performance optimization and cybersecurity blurred. Recognizing that applications required not only high availability but also protection from

---

[8] Tenable is a cybersecurity company that provides software and services to help organizations find, assess, and manage security vulnerabilities in their systems.

[9] Findings.co is a cloud-based vendor risk management and compliance platform that helps organizations automate cybersecurity, ESG, and third-party risk assessments across their supply chains.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

increasingly complex attacks, F5 strategically pivoted its product suite to integrate security into the core of its application delivery platform. For example, F5 incorporated encryption and decryption, web application firewalls ("WAFs"), and DDoS attack mitigation directly into BIG-IP. F5 also expanded its security portfolio through acquisitions, such as the 2019 acquisition of NGINX, which strengthened F5's position in modern, open-source web server and application infrastructure technology.

52. As a February 2025 *Forbes* article explained, F5 has evolved through three generations of application delivery control technology: "ADC 1.0" in the 1990s focused on basic traffic management and load balancing; "ADC 2.0" in the 2010s addressed public cloud-based delivery; and the current "ADC 3.0" era converges "high-performance load balancing and traffic management with advanced application and API security capabilities into a single platform."

53. By the start of the Class Period, F5 had transformed its business from a hardware-centric load balancing company into a self-described "security and software leader" that staked its identity, growth narrative, and investor value proposition on its cybersecurity capabilities. The ongoing demand for integrated security and application delivery solutions, as enterprises continued to modernize their IT environments, created a major opportunity for F5. Capitalizing on its position sitting in front of mission-critical applications, F5 evolved to focus on emerging application threats.

54. Accordingly, by the start of the Class Period, cybersecurity was a vital part of F5's identity and financial prospects. Throughout the period leading up to and during the Class Period, F5 told investors and customers that it had "substantially reshaped F5 from a hardware-centric, single-product company into a ***security*** and software leader." In its fiscal 2024 annual report, F5 represented that it is "the only company capable of securing, delivering, and optimizing any application and any API, regardless of its location or environment," and that "F5 delivers the most effective and comprehensive application and API security platform in the industry." On October 28, 2024, Defendant Locoh-Donou told investors "F5 over the last two decades, ***has***



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

***really mastered the expertise of securing*** and delivering a ***critical network and application traffic***," adding "[w]e bring ***consistent industry-leading security***."

55. Furthermore, F5 maintained an "F5 Labs" research arm dedicated to publishing cybersecurity threat intelligence. The Company posts articles concerning cybersecurity on the F5 Labs website under the header "Threat research. Security leadership. Decades of experience." For example, a February 20, 2024 article identified "CVE-2020-5902, a path traversal vulnerability in the F5 BIG-IP user interface." The F5 Labs website also states: "**Hundreds of apps will be attacked by the time you read this**. So, we get to work. ***We obsess over effective attack methods***. We monitor the growth of IoT and its evolving threats. We dive deep into the latest crypto-mining campaigns. We analyze banking Trojan targets. We dissect exploits. We hunt for the latest malware. And then our team of experts share it all with you. For more than 20 years, F5 has been leading the app delivery space. With our experience, we are passionate about educating the security community – providing the intel you need to stay informed so your apps can stay safe."

56. Security served as an engine of F5's growth story. Defendants consistently identified security as the key demand driver for F5's products. For example, on May 20, 2024 Defendant Locoh-Donou stated "Security has grown faster than our overall portfolio. And our expectation is that it's going to continue to grow faster than total revenue." On June 5, 2024, Defendant Fountain stated "today increasingly, security is the leading conversation with customers. Application security is a top of mind concern for organizations," and "[w]e find that in the majority of conversations really start on the security side. And so a lot of the conversations begin there … security is really the lead proposition in engaging with customers." Fountain added that F5 has "a very rich history of capabilities around application security and delivery . . . So you can secure and deliver your app regardless of which environment your application sits in and you can do it consistently then across all of those. And that will help drive a significant



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

improvement in security efficacy. And so you can secure your environment better." Defendants routinely promoted the Company's security expertise and capabilities as competitive advantages.

57. F5 reinforced these representations in its public filings and investor communications issued during the Class Period, identifying increased focus on security as a tailwind for its business and positioning the Company as uniquely capable of helping its customers withstand cybersecurity threats. For example, Defendant Werner stated at the November 2024 RBC conference, "[s]ecurity remains of paramount concern, especially in the federal government" and "security will continue to be a big driver of demand" for F5's products. On April 28, 2025, Defendants told investors "data delivery for AI workloads and increasingly also some use cases in security," acted as a "tailwind" for the business. In July 2025, Defendant Locoh-Donou stated "F5's ***unique ability to deliver and secure every app, every API anywhere*** on premises, in the cloud, at the edge and across hybrid multi-cloud environments is a ***significant competitive advantage***. ***It powered strong demand*** across both hardware and software deployment models in Q3." Similarly, on September 9, 2025, Defendant Locoh-Donou talked about how security contributes to cross-selling opportunities, stating when customers "discover the breadth of F5's portfolio and they discover F5 distributor cloud. ***They discover our API security solution. They discover what we've done with NGINX around security*** . . . we see a significant cross-sell opportunities into the estate to bring the breadth of the application delivery and security platform from F5 to these customers."

58. Before the Class Period, the market recognized security as an important piece of F5's growth. For example, a May 28, 2024 Piper Sandler report stated "One can see the puzzle pieces coming together as F5 is creating an end-to-end application delivery and security platform . . . that will enable it to better compete, with API Security being the latest important feature emerging in AppSec," adding "The API Security market . . . is expected to reach >$1B in the medium-term . . . Our back-of-the-envelope math on this implies a conservative $100-$200M opportunity within just F5's WAF installed base."



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

### C. Before and During the Class Period, F5's Products, Including BIG-IP Were Prime Targets for Cybersecurity Attacks, Including by Nation-State Actors

59. F5's centrality to widespread cybersecurity infrastructure made the Company and its products, including its flagship BIG-IP product, a prime target of nation-state and other sophisticated threat actors well before the Class Period. Because F5's products often occupy a central, privileged position in enterprise environments, they are extremely valuable to attackers seeking data theft, lateral movement, or large-scale compromise. When compromised, F5 can provide attackers with visibility into and control over traffic flowing through the device. This can expose privileged credentials, encrypted traffic, or other sensitive information that can be used to move laterally within a customer's network. In short, a breach at F5 can create the risk of rapid, widespread compromise of entire supply-chains.

60. For example, in 2021 and 2022, hackers actively compromised BIG-IP appliances by exploiting vulnerabilities carrying severity ratings of 9.8 out of 10. F5 software flaws were also the subject of a 2023 CISA alert, during which China-linked hackers exploited one of those vulnerabilities, as a Mandiant analysis concluded at the time.[10]

61. Palo Alto Networks Unit 42 stated "[g]iven the reach of F5's BIG-IP suite, well-resourced, sophisticated actors have focused on it in the past."[11] In late 2023, a critical authentication-bypass vulnerability in BIG-IP's Traffic Management User Interface (CVE-2023-46747) was exploited in the wild by UNC5174, a China-nexus threat actor, to create backdoor administrator accounts on BIG-IP devices.

62. In May 2024, security researchers at Eclypsium publicly disclosed that two high-severity vulnerabilities (CVE-2024-21793 and CVE-2024-26026) in F5's BIG-IP Next Central Manager could allow attackers to gain full administrative control of devices and to create hidden

---

[10] Mandiant is a leading cybersecurity firm, that investigates major cyber intrusions and tracks sophisticated hacking groups. It is a subsidiary of Google.

[11] Palo Alto Networks Unit 42 is an intelligence-driven, response-ready organization passionate about helping customers more proactively manage cyber risk. It brings together world-renowned threat researchers with an elite team of incident responders and security consultants.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

accounts on any downstream BIG-IP asset. As the Eclypsium researchers warned, "[t]hese weaknesses can be used in a variety of potential attack paths. At a high level attackers can remotely exploit the UI to gain administrative control of the Central Manager" and "Change passwords for accounts on the Central Manager. But most importantly, attackers could create hidden accounts on any downstream device controlled by the Central Manager." Eclypsium further stated it reported "5 vulnerabilities . . . to F5 in one batch, but F5 only formally assigned CVEs to the 2 unauthenticated vulnerabilities. We have not confirmed if the other 3 were fixed at the time of publication." Eclypsium further noted if the vulnerabilities were not fixed, "the device has a long-term way for an authenticated attacker to keep their access forever, which will be problematic."

63. In June 2024, Sygnia reported that the suspected Chinese state-sponsored group "Velvet Ant" used malware to maintain persistent access on outdated BIG-IP equipment for as long as three years, exfiltrating data from a targeted organization's network.[12] One of the mechanisms utilized for persistence was a legacy F5 BIG-IP appliance, which was exposed to the internet.

64. On July 24, 2025, Sygnia publicly reported that a Chinese state-sponsored espionage group designated "Fire Ant" had been exploiting vulnerabilities in both VMware and F5 BIG-IP products since early 2025 to maintain persistent access to victim networks. Sygnia reported that Fire Ant compromised F5 devices and deployed malicious tools that allowed the attackers to move between parts of victims' networks.

65. Defendants were thus well aware, before and throughout the Class Period, that (i) F5's products are used to secure governments, critical infrastructure, and the largest enterprises in the world; (ii) sophisticated nation-state actors, including Chinese state-sponsored groups, were actively targeting BIG-IP and other F5 products; and (iii) the Company's cybersecurity

[12] Sygnia describes itself as "the foremost global cyber readiness and response team, applying creative approaches and battle-tested solutions to help organizations beat attackers and stay secure."



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

capabilities and reputation were important to F5's ability to win, retain, and expand customer relationships, which included large corporations and government agencies. Against that backdrop, Defendants repeatedly highlighted F5's security capabilities and their importance to F5's customers. For example, Defendant Anand told investors in November 2024 that "cybersecurity is one of the most important" issues facing F5's customers and pointed specifically to the threat of "nation state attacks" against "some of the biggest companies in the world."

66. These prior incidents put Defendants on clear notice that F5's products were recurring targets for Chinese state-sponsored espionage groups seeking to compromise the critical infrastructure of F5's customers.

### D. F5 Highlights Its Security Capabilities Throughout the Class Period

67. The Class Period begins on October 28, 2024. As detailed below, throughout the Class Period Defendants repeatedly highlighted the Company's cybersecurity capabilities. For example, Defendants stated "[o]ur software, hardware, and software-as-a-service (SaaS) solutions ensure applications worldwide are performant and secure," that F5 offered "the most effective and comprehensive application and API security platform in the industry," and that the Company was uniquely positioned to help customers manage "escalating cyber risk." The Company's website further positioned F5 as an industry-leader in security, stating, for example, "[w]e obsess over effective attack methods," "[w]e monitor . . . evolving threats. We dive deep into the latest crypto-mining campaigns. We analyze banking Trojan targets. We dissect exploits. We hunt for the latest malware. And then our team of experts share it all with you."

68. In truth, and unbeknownst to investors: (1) F5's cybersecurity controls were deficient, with the Company admitting its controls were "uneven" and "[not] strong," in some areas; (2) F5's internal systems had been left vulnerable and exposed to the internet; (3) F5 reportedly failed to follow the same cybersecurity guidelines that it provided to its customers; and (4) these and other of F5's internal cybersecurity practices fell below industry standards and



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

left the Company vulnerable. Ultimately, the Company's deficient controls allowed a nation-state threat actor to penetrate F5's internal corporate network as early as late 2023 and maintain "long-term, persistent access" to F5's BIG-IP product development environment and engineering knowledge management platforms, exfiltrating BIG-IP source code and information regarding undisclosed vulnerabilities that F5 was working to patch.

69. Despite these severe cybersecurity failures, throughout the Class Period, Defendants repeatedly highlighted the Company's security capabilities, telling investors those capabilities were a significant aspect of the Company's competitive advantage, drivers of growth, and financial prospects. *See* Section V., below. During this time, investors were in the dark about the Company's critical cybersecurity failures that jeopardized F5's internal systems and reputation, the Company's prolonged failure to detect the intrusion, and the resulting dangers facing F5's customers.

70. Investors credited Defendants' representations regarding their cybersecurity posture. For example, in a December 22, 2024 report titled "The Next BIG Thing? Unpacking F5's AI Opportunities," Evercore ISI stated "F5 is seeing AI opportunities in three main segments" including "API Security: integrating DDoS, WAF, and other security solutions into a single platform to protect AI workloads." A January 29, 2025 Morningstar report raised F5's price target from $231 to $301, and stated F5's "security-focus" would help "achieve high rates of customer retention," stating "F5 is seeing strong customer interest in and demand for its security and load-balancing products, which are used for secure AI inference and AI data centers, respectively." A July 31, 2025 RBC Capital Markets report stated that "Management also believes F5 has a competitive edge in AI security as F5 sits in-line with traffic, so they are a natural insertion point to deploy AI monitoring capabilities." The report further identified "growth in security products by cross-selling into its core ADC market as well as stand-alone opportunities" as potential catalysts for growth. A July 7, 2025 Wolfe Research report notes that "F5 will become a much more valuable business as AI adoption expands among Enterprises. As



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

model usage scales, ***IT departments will need significantly more (and new) security***, load balancing, performance optimization, and automation capabilities embedded into their Data Center infrastructure. F5 is uniquely positioned."

71. Defendants' materially false and misleading statements and omissions of material fact propelled F5's stock price upward throughout the Class Period, reaching a Class Period high of $343.17 per share.

### E. Unknown to Investors, F5's Security Controls were Deficient Allowing a Threat Actor to Maintain Long-Term, Persistent Access to Critical F5 Systems

72. While the Company highlighted its commitment to cybersecurity and positioned itself as the industry's preeminent security platform, F5 and its senior executives concealed from investors that the Company's own internal cybersecurity controls had been deficient for years. Furthermore, unknown to investors at the time, a nation-state threat actor had penetrated F5's corporate network beginning in late 2023 and maintained "long-term, persistent access" to certain F5 systems before the intrusion was purportedly discovered in August 2025.

73. The attackers penetrated F5's computer systems by exploiting F5's own software that had been "***left vulnerable and exposed to the internet***," according to people briefed by F5 about the incident, as reported by Bloomberg on October 18, 2025. *Bloomberg* further reported that "***F5 told customers that the hackers were able to break in after the firm's staff failed to follow the cybersecurity guidelines it provides customers***." In other words, F5, the company that marketed itself as uniquely capable of securing the world's most sensitive networks, did not even follow the security practices that it recommended to its own customers. This failure was significant as hackers breached F5's systems in late 2023 and lurked in the Company's systems until August 2025, demonstrating a sustained failure of detection and response capabilities. The mechanism by which the threat actor was able to breach F5's systems further underscores the nature of F5's security failures.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

74. A forensic investigation has revealed that the Company's security deficiencies were even more extensive and long-standing than the Bloomberg report described. For example, F5's internal JFrog Artifactory, a large digital warehouse for software files and components related to the BIG-IP build pipeline, was publicly reachable on the open internet for over five years, from approximately November 2020 - April 2026. This system was extremely important because it was part of the process used to build and prepare BIG-IP software before it was released to customers, including large corporations and U.S. government agencies that rely on BIG-IP to protect critical infrastructure.

75. An internal build system like Artifactory is designed to be accessible only to a company's authorized personnel, such as engineers, because it contains the instructions, components, and tools used to assemble company products. Exposing the Artifactory to the open internet means that anyone can attempt to access it, dramatically increasing the risk that an attacker could steal proprietary code, inject malicious components into products before they reach customers, or gain a foothold into the company's broader network.

76. Despite the sensitivity of this infrastructure, F5 did not completely lock down or restrict access to the Artifactory. Internet-wide scanning databases indicate that this infrastructure was reachable from the public internet across at least fourteen distinct Azure IP addresses throughout this period. At times between November 2020 and May 2025, the system accepted unencrypted HTTP connections, creating a risk that sign-in information or data used to keep users signed in could have traveled without encryption. Furthermore, from 2022 through mid-April 2026, F5's Artifactory operated with an outdated, end-of-life web server that no longer received regular security updates, further increasing the system's vulnerability to attack.

77. The risk posed by this exposure was compounded by the absence of internal barriers between F5's systems. In a properly secured environment, a company's network is divided into separate zones so that, for example, the development environment where engineers write and test code is walled off from the production environment where finished products are



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

stored. This segmentation ensures that even if an attacker gains access to one area, they cannot freely move to others. Here, the evidence shows that F5's development and production Artifactory environments were not separated in this way. They both used the same security certificate and the same Microsoft sign-in account. This means an attacker who reached one system could potentially access others without encountering additional security barriers.

78. This configuration which left F5's infrastructure publicly exposed to the internet was a material deviation of public industry standards. F5's configuration of its systems violated JFrog's own Azure Reference Architecture, which specifies that Artifactory deployments must be placed behind network-level access controls and must not be directly reachable from the public internet. It was inconsistent with Microsoft's Cloud Security Benchmark ("MCSB"), the published security framework for Azure deployments, including controls NS-1 (establish network segmentation boundaries), NS-2 (secure cloud-native services with network controls), NS-7 (minimize network attack surface), PV-2 (audit and enforce secure configurations), and IM-3 (manage application identities securely). And it violated the same security principles underlying CISA Emergency Directive 26-01, which required agencies to identify and mitigate public-internet exposure of BIG-IP management interfaces, yet F5's own internal build infrastructure for BIG-IP remained publicly exposed while the Company assisted customers in complying with that directive. F5's configuration further deviated from the CIS Critical Security Controls, a baseline cybersecurity framework published by the Center for Internet Security, which recommends minimizing internet exposure to systems and services with a legitimate business need, encrypting sensitive data in transit, and promptly remediating, replacing, or retiring unsupported and end-of-life software.

79. These practices are also inconsistent with other relevant industry standards F5 itself publicly represented the Company followed during the Class Period, including those related to the National Institute of Standards and Technology ("NIST") and International Organization



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

for Standardization ("ISO").[13] Indeed, F5 publicly represents ISO 27001 certification and publishes a SOC 2 (System and Organizations Control) report for certain of its operations. [14] The practices documented here fall below the standard of care these frameworks require, a standard F5 represented it maintained for several of its operations. For example, during the Class Period F5 stated "F5 Distributed Cloud Services are ISO 27001 Certified with an extension of ISO 27017 and ISO 27018."[15] F5's configuration was also inconsistent with the controls prescribed by NIST SP 800-53, the federal security framework widely adopted across the cybersecurity industry, including requirements for boundary protection, encryption in transit, and timely vulnerability remediation. During the Class Period, F5 marketed a dedicated configuration tool to help its customers apply NIST SP 800-53 security controls to BIG-IP devices, yet failed to apply equivalent controls to its internal infrastructure. Specifically, F5's website stated: NIST Special Publication 800-53 "is a core standard defining how to approach information security and risk management within the federal government" that "provides guidance on continuous

---

[13] During the Class Period, F5's website, at a webpage titled "F5 Trust Center," stated: "F5 maintains an active product certification and evaluation program to maintain secure IT environments. Key certifications include FIPS, ***NIST, ISO***, JIST PKE, and more. ***Gaining and adhering to these certifications helps ensure the F5 products you use are safe in any environment***."

[14] A System and Organizations Control (formerly Service Organization Control) or SOC 2 report is a report that focuses on the American Institute of Certified Public Accountants (AICPA) trust principles. It generally examines a service provider's internal controls and systems related to security, availability, processing integrity, confidentiality, and privacy of data.

[15] F5 also stated: "ISO 27001 is an international standard to manage information security. It is the world's best-known standard for information security management systems (ISMS). The ISO 27001 standard provides companies of any size and from all sectors of activity with guidance for establishing, implementing, maintaining and continually improving an information security management system. ***Conformity with ISO 27001 means that an organization or business has put in place a system to manage risks related to the security of data owned or handled by the organization, and that this system respects all the best practices and principles enshrined in this International Standard***. ISO 27001 promotes a holistic approach to information security by vetting people, policies, and technology. An information security management system implemented according to this standard ensures risk management, cyber-resilience, and operational excellence."



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

monitoring and FISMA requirements. It also supports a risk-based approach to protecting critical missions and business functions."

> F5 has distilled this 240-plus page document into an F5 iApp for NIST 800-53 Rev 4. The iApp provides several pages of relevant questions and tasks to assist the administrator in applying the relevant security controls on their BIG-IP device, saving organizations hours of management time and resources.
>
> If your agency is looking to improve the DIACAP process, or looking to comply with FISMA, then the F5 NIST 800-53 Rev 4 iApp will help ensure the proper configuration settings on the BIG-IP are reviewed and set.

80. The public accessibility of this infrastructure was not a transient misconfiguration or an isolated oversight. TLS certificates[16] for the Artifactory deployment were renewed on multiple occasions throughout the five-year exposure window, which suggests F5 continued to update and maintain an exposed system. Each certificate renewal is a deliberate operational event and the exposure persisted through multiple such renewal cycles.

81. Moreover, F5's post-Breach response shows it treated segmentation as a serious problem. After the Breach, F5 created a new, separate version of its build systems that ran alongside the old ones on a separate domain, under a different public certificate authority, and in a separate Microsoft tenant. These are steps consistent with improved segmentation and should have been applied to this environment before the Breach.

82. The architecture of F5's exposed infrastructure made it vulnerable to compromise through multiple vectors, underscoring the critical nature of F5's security failures and the unevenness of its security controls. F5's acknowledgments after the Security Breach further support this conclusion, with the Company admitting that: "Our controls ***were uneven***."

83. F5's access controls were not uniformly implemented across the enterprise. For example, while some teams performed user-access reviews to prevent over-privileged access to

---

[16] A TLS certificate is a digital certificate used by a website, server, or application to prove its identity and enable encrypted communications over the internet.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

applications, other departments never reviewed access at all. This failure to implement and enforce access controls across all departments is consistent with F5's October 22, 2025 admission that its controls were "uneven."

84. Leadership turnover also contributed to the Company's cybersecurity deficiencies. From 2018 through 2025, F5 cycled through four CISOs: Mary Gardner, Gail Coury, Samir Sherif, and Christopher Burger. The CISO is the senior executive directly responsible for an organization's cybersecurity strategy, threat detection, vulnerability management, and security operations. Having four different individuals in this role over a seven-year period is a significant indicator of organizational dysfunction with respect to security.

85. And due to the extreme turnover and short tenures of these CISOs, the role lacked the continuity and stability necessary to be effective. This led to concrete operational consequences, a lack of direction, and issues arising from an unclear mission. This dysfunction and the leadership changes contributed to and enabled the conditions that allowed the Breach. Notably, on October 9, 2025, days before the Breach was disclosed publicly, a sitting member of F5' Board of Directors resigned and was immediately appointed to a newly created executive role charged with "build[ing] and operat[ing] the Company with security at its core," providing an additional inference of the Company's deficient security posture prior to the Breach.

86. The constant level of turnover and layoffs extended well beyond the CISO. For example, the Company laid off almost a thousand people over an eighteen-month period covering the Class Period, including people working on key security projects, such as a Platform Security Architect who was a founding member of the platform security unit.

87. The deficiencies in F5's internal security controls extended beyond network architecture to basic credential management. During the Class Period, certain F5 internal systems used default and trivially guessable passwords, including credentials such as factory default administrative credentials. In addition, at least four sets of credentials to core development



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

systems were captured by information stealing malware and appeared on the dark web between 2022 and 2025.

88. Notably, commercially available threat-intelligence services can continuously monitor dark-web and cybercrime marketplaces for stolen corporate credentials. Such monitoring is a standard means of implementing the credential-hygiene, threat-detection, access-control, and vulnerability-management controls contemplated by frameworks and attestations F5 publicly invoked, including ISO 27001/27002. The persistence of compromised credentials in F5's environment therefore supports the inference that F5 either failed to deploy effective credential-exposure monitoring or received alerts and failed to timely remediate them. The use and leakage of factory-default and easily guessed passwords on internal systems is generally recognized as among the most fundamental security failures, one that any competent vulnerability assessment or penetration test would immediately identify and remediate. The persistence of such credentials is inconsistent with the "regular testing and assessments to identify vulnerabilities" that F5 represented in its SEC filings, supporting an inference that F5's vulnerability-assessment and credential-monitoring processes were either insufficient or insufficiently remediated.

89. Through the prolonged period where hackers had undetected access, they targeted and compromised F5's BIG-IP product development environment and engineering knowledge management platforms, which contained F5's most valuable and sensitive intellectual property. The attackers exfiltrated files containing portions of BIG-IP source code, internal documentation on undisclosed vulnerabilities that F5 was actively working to patch, and configuration and implementation information for certain of F5's customers. The exfiltration of source code and undisclosed vulnerability information was particularly dangerous because it could provide the threat actor with the ability to conduct analysis of BIG-IP to identify additional flaws and vulnerabilities and to develop targeted exploits. This could effectively serve as a roadmap to compromise BIG-IP devices deployed across the networks of F5's thousands of customers.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

90. The hackers originally accessed F5's systems through VMware, whose cloud infrastructure is integrated with F5's BIG-IP product.[17] In addition to the BIG-IP product development environment, hackers also accessed Confluence and Bugzilla, which provide software tools used by development and engineering teams, further expanding the scope of compromised systems and the breadth of sensitive information available to the threat actor. The VMware intrusion vector is significant because, in July 2025 the China-nexus group "Fire Ant" was widely reported to be exploiting VMware and F5 flaws in combination.

91. As Palo Alto Networks' research arm Unit 42 warned, "the top priority for any organization using F5 BIG-IP is to implement mitigation and hardening guidance without delay and begin threat hunting activities immediately," noting that "if an attacker steals source code it takes time to find exploitable issues. In this case, [the hackers] also stole information on undisclosed vulnerabilities that F5 was actively working to patch. ***This could provide the ability for threat actors to exploit vulnerabilities that have no public patch, potentially increasing speed to exploit creation***." In other words, the hackers stole not just F5's software code, but also confidential information about security weaknesses that F5 already knew about and was still working to fix. This was especially dangerous because attackers could use that information to identify and exploit those flaws before public patches were available or before customers had applied them. This allows attackers to develop exploits more quickly and effectively.

92. With the source code obtained from F5, hackers could use it to identify vulnerabilities in order to breach client systems, compounding the downstream risk to F5's customers. In addition to the exploit-development and vulnerability risks, the theft of F5 source code created a separate risk of intellectual-property theft that can be very difficult to detect.

[17] VMware is a widely used enterprise software platform that enables organizations to efficiently manage and operate their computing infrastructure, including data centers and cloud environments.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

93. Highlighting the large scale of potential downstream harm for F5's security failures, one industry publication noted that the Security Breach "endangers more than 600,000 internet-connected devices."

94. Furthermore, F5 had unpatched critical vulnerabilities during the Class Period. One critical vulnerability existed for nearly ten years before a report was made on October 13, 2025.[18] Furthermore, F5 failed to report vulnerabilities to CISA as required and instead only issued reports online, which were more likely to be monitored by threat actors than affected customers.

95. F5 itself ultimately acknowledged the deficiency of its internal controls. On October 22, 2025, one week after the initial disclosure, F5 CISO Christopher Burger authored a post on the Company's website titled "Lessons we are learning from our security incident," in which F5 "take[s] full ownership of" the "major security incident" and admitted: "***Our top takeaway so far: Our controls were uneven*** – strong in some places and ***not in others***." Burger further stated that F5 needed to "restor[e] trust" and "rais[e] the security bar," acknowledging that F5 had inadequate "automation in [its] inventory and patch management," insufficient "monitoring for detection and response," deficient "zero-trust capabilities across [its] infrastructure and operations," and lacked "advanced endpoint visibility [for] F5 BIG-IP."

96. These admitted deficiencies addressed fundamental aspects of F5's internal cybersecurity infrastructure and are consistent with the conclusion that F5's internal controls were deficient throughout the Class Period as Defendants were assuring investors of the Company's security capabilities. Controls were not uniformly implemented across the enterprises, and in fact were poorly implemented in certain areas.

97. The severity of the Breach prompted a strong and pointed response from the federal government. On October 15, 2025, the same day F5 disclosed the Breach, CISA issued Emergency Directive ED 26-01, mandating that all U.S. federal civilian agencies immediately

[18] https://my.f5.com/manage/s/article/K000156994.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

inventory all F5 BIG-IP devices, apply vendor-issued security patches by October 22 for core products and by October 31 for all other F5 products, disconnect and decommission any unsupported F5 devices, and harden all public-facing F5 systems. The directive described the breach as presenting "***an imminent threat to federal networks using F5 devices and software***," warning that "[s]uccessful exploitation of the impacted F5 products could enable a threat actor to access embedded credentials and Application Programming Interface (API) keys, move laterally within an organization's network, exfiltrate data, and establish persistent system access. ***This could potentially lead to a full compromise of target information systems***." CISA Acting Director Madhu Gottumukkala stated that ***"[t]he alarming ease with which these vulnerabilities can be exploited by malicious actors demands immediate and decisive action***," adding that "[t]hese same risks extend to any organization using this technology, potentially leading to a ***catastrophic compromise of critical information systems***." The U.K.'s National Cyber Security Centre issued a parallel alert the same day, warning the Security Breach "could enable a threat actor to[] exploit F5 devices and software," and "conduct static and dynamic analysis for identification of logical flaws and vulnerabilities as well as the ability to develop targeted exploits."

98. Cybersecurity experts drew comparisons between the F5 breach and the SolarWinds breach disclosed in December 2020, which is considered by many to be one of the worst cybersecurity incidents in U.S. history. As *Reuters* reported, "[s]everal cybersecurity executives and analysts compared the hack at F5 to the extraordinary intrusion at the software company SolarWinds." Tenable's Chief Security Officer called the F5 breach "***a five-alarm fire for national security***," stating that "it's important to understand that this isn't just another piece of software, but a foundational technology used to secure everything from government agencies to critical infrastructure. ***In the hands of a hostile actor, this stolen data is a master key that could be used to launch devastating attacks***." Flashpoint's intelligence team observed that "this incident has distinct similarities to other notable nation-state cyberattacks, such as OPM,



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

SolarWinds, and attacks targeting critical infrastructure and telecoms." The Zscaler Security Advisory concluded that "[t]he scale of this breach – encompassing stolen source code, internal vulnerability documentation, and customer configurations – transformed it from a corporate intrusion into an issue of national security."

99. Notably F5 detected the intrusion on August 9, 2025, but kept the Breach a secret from the public until October 15, 2025, more than two months later. In its SEC filing disclosing the Breach, F5 stated that on September 12, 2025, the DOJ approved the Company's request to delay its Form 8-K filing under Item 1.05(c). SEC rules require disclosure of a material security breach within four business days upon determination that the incident is material,[19] but F5 delayed disclosure based on the contention that "immediate disclosure would pose a substantial risk to national security or public safety."

100. Between the time F5 purports to have detected the Breach on August 9, 2025 and when the Company disclosed the Breach on October 15, 2025, Defendants continued to make positive (but false) statements to investors about F5's industry leading security capabilities. On September 9, 2025, one month after F5 internally confirmed the Breach and three days before the DOJ purportedly granted the disclosure-delay request, Defendants Locoh-Donou and Werner attended and presented at the Goldman Sachs Communacopia & Technology Conference. With full knowledge of the active and ongoing nation-state intrusion, and awareness that F5's security protocols were deficient, Locoh-Donou told investors that F5 was "absolutely critical to all application security," and explained that F5 "control[s] 100% of the traffic going into mission-critical applications."

101. Two days later, on September 11, 2025, Defendants highlighted the Company's industry-leading cybersecurity capabilities, stating that F5 is the "***the global leader that delivers and secures every app.*** Backed by three decades of expertise, ***F5 has built the industry's premier***

[19] The SEC's Final Rule regarding "Cybersecurity Risk Management, Strategy, Governance, and Incident Disclosure" notes that "'Doubts as to the critical nature' of the relevant information should be 'resolved in favor of those the statute is designed to protect,' namely investors."



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

***platform*** – F5 Application Delivery and Security Platform (ADSP) – ***to deliver and secure every app, every API, anywhere: on-premises, in the cloud, at the edge, and across hybrid, multicloud environments***."

102. At no point during this period did Defendants disclose the breach, modify or temper claims that F5's security protocols and systems were industry leading, or alert investors to the risks posed by the security failures and the ongoing intrusion. When the Company finally disclosed the breach and its financial ramifications, including that threat actors had maintained long-term persistent access in F5's systems, the Company's stock price cratered, harming investors and erasing more than $4.5 billion of the Company's market capitalization.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A. False and Misleading Statements on the Company's Website

103. Throughout the Class Period, the F5 Labs website stated:

> Hundreds of apps will be attacked by the time you read this. ***So, we get to work. We obsess over effective attack methods. We monitor the growth of IoT and its evolving threats. We dive deep into the latest crypto-mining campaigns. We analyze banking Trojan targets. We dissect exploits. We hunt for the latest malware. And then our team of experts share it all with you***. For more than 20 years, F5 has been leading the app delivery space. With our experience, ***we are passionate about educating the security community – providing the intel you need to stay informed so your apps can stay safe***.

104. Similarly, throughout the Class Period, the Company's website also featured a webpage titled "F5 Trust Center," which contained a series of representations regarding F5's commitment to security and the protection of customer data. The F5 Trust Center website maintains that "***F5 upholds the highest standards to safeguard your data and maintain your trust***. From GDPR compliance ***to industry certifications***, explore how we prioritize your privacy and security." Under the heading "Security," F5 stated "***Privacy and security are paramount to everything we do at F5. Our customers trust us with their data and we repay that trust with our unwavering dedication to safeguarding it every step of the way***." Under the heading, "Peace of



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

Mind," F5 stated "***Rest assured, we prioritize your security above all, ensuring your data is handled with utmost care***. The information included in the Trust Center illustrates that the privacy of our customers is our highest priority."

105. The Trust Center website also highlighted F5's security-related certifications, stating: "***Certifications: F5 maintains an active product certification and evaluation program to maintain secure IT environments. Key certifications include FIPS, NIST, ISO, JIST PKE, and more. Gaining and adhering to these certifications helps ensure the F5 products you use are safe in any environment***."

106. The Trust Center also included a dedicated ISO certification page, stating ***"F5 Distributed Cloud Services are ISO 27001 Certified with an extension of ISO 27017 and ISO 27018***" and that "***Global Support is ISO 27001 certified only***." The page described the significance of these certifications in expansive terms, stating that "***[c]onformity with ISO 27001 means that an organization or business has put in place a system to manage risks related to the security of data owned or handled by the organization, and that this system respects all the best practices and principles enshrined in this International Standard***." The page further stated that "***ISO 27001 promotes a holistic approach to information security by vetting people, policies, and technology***" and that "***[a]n information security management system implemented according to this standard ensures risk management, cyber-resilience, and operational excellence***."

107. Separately, the Trust Center included a Product Certification page on F5's website. The Product Certification page stated that "***F5 maintains an active product certification and evaluation program – aligned with government regulations – for maintaining a secure IT environment***." The page further represented that a key benefit of F5's products was "***[s]ecure resources –F5 solutions safeguard the integrity of businesses by keeping corporate resources safe and protecting corporate brands***."



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

108. During the Class Period, and no later than June 1, 2025, F5 published a webpage titled "Zero Trust Architecture Solutions," which stated: "F5 enables zero-trust architectures that optimize your investments and extend zero-trust security across your entire portfolio." The webpage further stated that "In today's world . . . zero-trust is a must. App access control is key to any zero-trust architecture but so are the capabilities that secure and protect APIs, data, workloads, networks, users, and devices. ***The F5 Application Delivery and Security Platform (ADSP) is the foundation for Zero Trust Architectures***" and that "***F5 ADSP delivers visibility, enforcement, and intelligence where it matters most: the application layer***." F5 also represented that it "***supports nearly any zero-trust architecture providing context-aware access, deep traffic inspection, API protection, and dynamic policy enforcement across legacy, modern, and AI applications***," and that "[e]very app and API – no matter where its deployed – benefits from consistent, comprehensive delivery and security."

109. The same webpage touted "[l]east privileged access and continuous monitoring," stating that F5 could "***ensure per-request app access and the least privileged access necessary for users to do their jobs***" and "***[c]onstantly monitor dynamic context and identity-based access policies along with behavioral analysis***." F5 further stated that ADSP ensured "***an ultra-secure environment***" extending "***critical zero trust security capabilities to every strategic point in your infrastructure***," and that F5's web app and API protection could "***inspect every request, enforce security policies, and mitigate threats across hybrid multicloud environments***." It further stated that F5 could "***[p]revent sensitive data leaks with real-time, in-transit AI data classification, policy-driven enforcement, and continuous monitoring – all while eliminating risks from Shadow AI***."

110. The statements on F5's website highlighting the Company's cybersecurity capabilities identified in ¶¶103-109 above were materially false and misleading when made. While F5 represented that it "obsess[ed]" over cybersecurity issues, "upholds the highest standards to safeguard your data," that it maintained an "active product certification and



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

evaluation program" aligned with ISO, NIST, and similar frameworks, that "F5 Distributed Cloud Services are ISO 27001 Certified," and that conformity with ISO 27001 "ensures risk management, cyber-resilience, and operational excellence," that F5's platform ensured "an ultra-secure environment" extending "critical zero trust security capabilities to every strategic point in your infrastructure," and that it could "inspect every request, enforce security policies, and mitigate threats across hybrid multicloud environments," those representations did not square with what was happening inside F5. As detailed above in Section IV.E, F5's internal cybersecurity controls had been deficient for years and departed from industry standards for cybersecurity, including standards F5 itself publicly endorsed and claimed to follow. F5 maintained sensitive BIG-IP build infrastructure that was publicly reachable from the internet, accepted unencrypted HTTP connections, lacked appropriate segmentation, ran end-of-life software, and used default or trivially guessable credentials even as multiple sets of development credentials circulated on the dark web between 2022 and 2025. Furthermore, the Company left software exposed to the internet and failed to follow the cybersecurity guidance it provided to customers. These deficiencies allowed a nation-state actor to maintain long-term, persistent access to F5's BIG-IP product development environment and engineering knowledge management platform and to exfiltrate BIG-IP source code, undisclosed vulnerability information, and customer configuration or implementation information, creating grave risks to customers whose critical systems depended on BIG-IP. The attackers penetrated F5's systems in late 2023 and had maintained persistent access at the time these statements were made. F5 itself admitted that its "controls were uneven – strong in some places and not in others," and rolled out the kind of basic remedial measures (inventory and patch management, monitoring, detection and response, zero-trust capabilities, BIG-IP endpoint visibility, and a new C-suite role devoted to security) that a company holding itself out to the investing public the way F5 did would have already had in place. The Company also admitted its own "configuration guidance" specifies "that management interfaces should never be exposed to the public Internet." Following the



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

Breach, industry participants criticized the Company's security posture, with one stating that F5 allowing the attacker to remain in its systems for two years was "staggering," and that this spoke to deficiencies with the Company's "security culture, tooling, and operational maturity," and another stating F5's "IT infrastructure has consistently demonstrated noncompliance with even minimal security standards."

### B. False and Misleading Statements During F5's October 28, 2024 Q4 2024 Earnings Call

111. On October 28, 2024, F5 held a conference call to discuss the Company's financial results for the fourth quarter and fiscal year 2024 (the "Q4 2024 Earnings Call"). Defendants Locoh-Donou and Werner participated in the call on behalf of the Company. During the Q4 2024 Earnings Call, Defendant Locoh-Donou highlighted the Company's security capabilities, stating "***F5 over the last two decades, has really mastered the expertise of securing*** and delivering a ***critical network and application traffic across data centers and cloud***," and "[w]e bring ***consistent industry-leading security***." Defendant Locoh-Donou also stated: "***Our unique strength lies in our ability to secure any app anywhere***." During the call, Defendant Locoh-Donou also stated "F5 delivers ***the most effective and comprehensive app and API security platform in the industry***" adding "[i]n a relatively short period of time, we have substantially reshaped F5 from a hardware-centric, single product company into a ***security and software leader*** in today's hybrid multi-cloud world." Defendant Locoh-Donou further stated "we know that the two decades of expertise that we have amassed in high-performance traffic management and ***security*** directly applies to the AI workloads and that ***no one brings that expertise to the table today or, frankly, in the foreseeable future.*** So we are pretty confident about the differentiation in the technical solution."

112. The statements identified in ¶111 above were materially false and misleading when made. Defendants represented that F5 had "really mastered the expertise of securing" critical network and application traffic, that it brought "consistent industry-leading security," that its "unique strength lies in [its] ability to secure any app anywhere," that it delivered "the most



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

effective and comprehensive app and API security platform in the industry," and that "no one brings that expertise to the table today or, frankly, in the foreseeable future." As detailed in Section IV.E, F5's internal cybersecurity controls were deficient for years and departed from industry standards and the Company's own internal guidelines. F5's BIG-IP build infrastructure was publicly exposed to the internet for over five years, lacked proper segmentation, ran end-of-life software, and relied on default or trivially guessable credentials, even as compromised development credentials circulated on the dark web between 2022 and 2025. Furthermore, the Company left software exposed to the internet and failed to follow the cybersecurity guidance it provided to customers. These deficiencies allowed a nation-state threat actor to penetrate F5's corporate network in late 2023 and maintain long-term, persistent access to F5's BIG-IP product development environment and engineering knowledge management platform, exfiltrating BIG-IP source code, undisclosed vulnerability information, and customer configuration or implementation information. At the time of these statements, the nation-state intrusion was ongoing and undetected. Accordingly, Defendants' assertions that F5 "mastered the expertise of securing" critical application traffic or delivered "consistent industry-leading security" were materially misleading because F5 had inadequate inventory and patch management, deficient monitoring and detection, deficient zero-trust capabilities, and lacked BIG-IP endpoint visibility. Claims of unmatched technological leadership in security, that "no one brings that expertise to the table today or, frankly, in the foreseeable future," were false given the Company's acknowledged deficient controls and demonstrated inability to secure its own internal infrastructure. Following the Breach, one industry participant criticized F5's security posture as reflecting deficiencies in its "security culture, tooling, and operational maturity," and another stated F5's "IT infrastructure has consistently demonstrated noncompliance with even minimal security standards."



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

### C. False and Misleading Statements During the November 19, 2024 Needham Security, Networking, and Communications Conference

113. On November 19, 2024, F5 participated in the Needham Security, Networking, and Communications Conference. During the conference, in response to an analyst question about the market's "appetite" "for a consolidated offering around WAF and API security," Defendant Fountain stated:

> Yes. So you're absolutely right. APIs are already one of the greatest threats for organizations. They're often exploited by adversaries and very few organizations actually have a good handle on their API security.
>
> . . .
>
> And in order to truly protect APIs, you need to do several things. You got to be able to discover all your APIs. You must be able to scan and analyse the code for those APIs. They need runtime protections that are able to monitor the calls against those APIs. And finally, you've got to be able to enforce and block malicious actors in line real time. And competitors provide point solutions around sort of each of those individual areas. ***We instead have taken a single holistic best-in-class approach to bringing all of those together into a very comprehensive API security solution. And we feel very good about the completeness of our offering here. No one else is able to deliver this same range what we call shift left and shield route***.

114. In response to a follow-up question asking, "What sort of growth do you see coming out of the what market?" Defendant Fountain stated: "Yes. So we see customers increasingly looking for vendors that are able to bring all four of these technologies together. ***So web application firewall, anti-bot distributed denial of service and API security, all into one complete offering. We have a very complete offering that's highly differentiated in those areas. And so we feel very good both about the growing customer demand for these regions as well as our competitive position***."

115. The statements identified in ¶¶113-114 above were materially false and misleading when made. Defendant Fountain represented that F5 had taken a "single holistic best-in-class approach" to API security, that F5 felt "very good about the completeness of our



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

offering," that "[n]o one else is able to deliver this same range," and that F5 had "a very complete offering that's highly differentiated." As detailed in Section IV.E, F5's internal cybersecurity controls were deficient for years and departed from industry standards and the Company's own guidelines. F5's BIG-IP build infrastructure was publicly reachable from the internet, lacked appropriate segmentation, ran end-of-life server software, and used default or trivially guessable credentials. Furthermore, the Company left software exposed to the internet and failed to follow the cybersecurity guidance it provided to customers. These deficiencies enabled a nation-state threat actor to penetrate F5's corporate network in late 2023 and maintain long-term, persistent access to the Company's system, exfiltrating source code and other critical information. F5 could not credibly claim to offer a "best-in-class" or "highly differentiated" security solution when, by its own admission, the Company had inadequate inventory and patch management, deficient monitoring and detection, lacking zero-trust capabilities, and lacked BIG-IP endpoint visibility.

### D. False and Misleading Statements During the November 20, 2024 RBC Capital Markets Conference

116. On November 20, 2024, F5 participated in the 2024 RBC Capital Markets Global Technology, Internet, Media and Telecommunications Conference. Defendants Anand and Werner participated in the conference on behalf of the Company. In response to a question asking "from a cyber perspective, obviously, there's dedicated folks in that space that are – that's all they do. Does F5 have to change anything to kind of be thought of as more like a first-party provider from a cyber perspective when you're competing with the Zscaler or Palo or some of the firewall vendors?" Defendant Anand stated: "Yeah. What was very encouraging was earlier this year, we ended up getting rate by IDC in their market cap as the leader in web applicant to and that was awesome to see. ***And so just a testament to the fact that we've been either acquiring or bringing in the right pieces or developing the right technology at web application, API protection and (inaudible) protection as well. So I think we've got the right pieces to go after this and really help customers***."



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

117. Also during the 2024 RBC Conference, Defendant Anand stated that "***we have the ability before people deploy applications to production to identify risks in those underlying applications and in those APIs*** and with the tight integration that we have in our platform, ***we can actually go in and allow them [customers] to click the single button to mitigate***."

118. The statements identified in ¶¶116-117 above were materially false and misleading when made. Defendant Anand represented that F5 had been "acquiring or bringing in the right pieces or developing the right technology" for application and API security, that F5 had "the right pieces to go after this and really help customers," and that F5 had "the ability before people deploy applications to production to identify risks in those underlying applications and in those APIs." As detailed in Section IV.E, F5's internal cybersecurity controls were deficient for years and fell below industry standards and F5's own guidelines. F5's own BIG-IP build infrastructure was publicly exposed to the internet for over five years, lacked proper segmentation, ran end-of-life software, and relied on default or trivially guessable credentials. Furthermore, the Company left software exposed to the internet and failed to follow the cybersecurity guidance it provided to customers. These failures enabled a nation-state threat actor to penetrate F5's network in late 2023 and maintain persistent, undetected access to the BIG-IP product development environment, exfiltrating source code, undisclosed vulnerability information, and customer configuration or implementation information. Claims of technological leadership in security were misleading in light of F5's demonstrated inability to secure its own internal infrastructure. The assertion that F5 had "the ability before people deploy applications to production to identify risks" was particularly misleading given that F5 failed to identify fundamental risks in its own infrastructure that persisted for years, deficiencies that a competent vulnerability assessment would have uncovered. F5 admitted that the Company's inventory and patch management system was inadequate and F5 had deficient monitoring and detection, lacked adequate zero-trust capabilities and did not have BIG-IP endpoint visibility.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

### E. False and Misleading Statements During the December 10, 2024 Raymond James TMT Conference

119. On December 10, 2024, F5 participated in the Raymond James TMT Conference. In response to a question from a securities analyst about "bright spots" for 2025, Defendant Werner stated "[w]e're really kind of ***at the top end of security use cases*** and efficiency initiatives." During the same conference, Defendant Werner stated that F5's mission and growth opportunity included "ensuring that [customers] get the value expected from their apps . . . ***without sacrificing . . . the security of these applications***," and that F5 had built "a common platform that really allows our customers to unify the delivery ***and security of these apps and APIs***."

120. The statements identified in ¶119 above were materially false and misleading when made. Defendant Werner represented that F5 was "really kind of at the top end of security use cases and efficiency initiatives," that F5's mission included "ensuring that [customers] get the value expected from their apps . . . without sacrificing . . . the security of these applications," and that F5 had built "a common platform that really allows our customers to unify the delivery and security of these apps and APIs." As detailed in Section IV.E, F5's internal cybersecurity controls were deficient for years and departed from industry standards. F5's BIG-IP build infrastructure was publicly exposed to the internet for over five years, lacked proper segmentation, ran end-of-life software, and relied on default or trivially guessable credentials. Furthermore, the Company left software exposed to the internet and failed to follow the cybersecurity guidance it provided to customers. These deficiencies enabled a nation-state threat actor to penetrate F5's network in late 2023 and maintain persistent, undetected access to the BIG-IP product development environment, exfiltrating sensitive information such as source code. At the time of these statements, the intrusion had been ongoing for more than a year. Werner's assertion that F5 was at "the top end of security use cases" and had built a platform allowing customers to "unify the delivery and security" of their applications was materially misleading because the Company lacked basic security measures, such as adequate inventory and



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

patch management, detection and response monitoring, zero-trust capabilities, and BIG-IP endpoint visibility that a company at the "top end" of security would have already had in place.

### F. False and Misleading Statements in F5's 2024 Form 10-K and 2024 Annual Report

121. On November 18, 2024, F5 filed with the SEC its Form 10-K for the fiscal year ended September 30, 2024 (the "2024 Form 10-K"), which was signed by Defendant Locoh-Donou. The 2024 Form 10-K stated "Our cybersecurity risk management program is led by our Chief Information Security Officer ('CISO'), who manages our security team and is principally responsible for our cybersecurity risk assessment processes, our security controls, and our detection and response to cybersecurity incidents. ***Our program includes protocols for preventing, monitoring, detecting and responding to cybersecurity events and incidents. . . .***", including "***monitoring, detection and collection and analysis of information regarding evolving, ongoing, and emerging threats and vulnerabilities, and corresponding actions to assess and remediate corresponding risks***" and "***regular testing and assessments to identify vulnerabilities***."

122. The 2024 Form 10-K also stated "As of the date of this report, we do not believe that any risks from cybersecurity threats, including as a result of any previous cybersecurity incidents, ***have materially affected or are reasonably likely to materially affect our Company, including our business strategy, results of operations or financial condition***."[20]

123. On January 27, 2025, F5 filed its 2024 Annual Report with the SEC. The 2024 Annual Report included a letter to shareholders, customers, and partners from Defendant Locoh-Donou stating that "***Our software, hardware, and software-as-a-service (SaaS) solutions ensure applications worldwide are performant and secure***."

---

[20] The Company's quarterly reports filed with the SEC on February 7, 2025, May 6, 2025, and August 6, 2025 each stated: "***There have been no material changes to our risk factors*** from those described in Part 1, Item 1A, "Risk Factors" of our Annual Report on Form 10-K for the fiscal year ended September 30, 2024, which was filed with the Securities and Exchange Commission on November 18, 2024."



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

124. Defendant Locoh-Donou also stated, "F5 is the ***only company capable of securing,*** delivering, and optimizing ***any application and any API, regardless of its location or environment*** – be it in a data center, any one of the public clouds, or at the network edge." The letter further stated "F5 is differentiated in three critical areas," including that: "F5 delivers the ***most effective and comprehensive application and API security platform in the industry***. We enable our customers to consolidate point products targeting specific threats onto a single, integrated platform with a suite of ***best-in-class capabilities***."

125. Defendant Locoh-Donou's letter also stated "***F5 empowers our customers to establish a consistent security posture across all their applications, enhancing security***, streamlining operations, and reducing costs," and that F5 was "unifying our solutions to provide customers with ***unprecedented levels of visibility, manageability, and automation***."

126. The 2024 Annual Report also repeated the statements from the 2024 Form 10-K contained in ¶¶121-122 above.

127. The statements identified in ¶¶121-126 above were materially false and misleading when made. In the 2024 Form 10-K, Defendants represented that F5's cybersecurity risk management program included "protocols for preventing, monitoring, detecting and responding to cybersecurity events and incidents," "monitoring, detection and collection and analysis of information regarding evolving, ongoing, and emerging threats and vulnerabilities, and corresponding actions to assess and remediate corresponding risks," and "regular testing and assessments to identify vulnerabilities." The 2024 Form 10-K also stated that cybersecurity risks had not "materially affected or are reasonably likely to materially affect" the Company. In the 2024 Annual Report, Defendants represented that F5's solutions "ensure applications worldwide are performant and secure," that F5 was "the only company capable of securing, delivering, and optimizing any application and any API, regardless of its location or environment," and that F5 delivered "the most effective and comprehensive application and API security platform in the industry."



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

128. As detailed in Section IV.E, F5's internal cybersecurity controls were deficient for years and departed from industry standards and the Company's own guidelines. The purported "protocols for preventing, monitoring, detecting and responding to cybersecurity events" were demonstrably inadequate: F5 failed to detect a nation-state intrusion for approximately two years, during which the threat actor maintained persistent access to the BIG-IP product development environment, exfiltrated source code, undisclosed vulnerability information, and customer configuration or implementation information, and remained undetected until the FBI alerted F5. The representation that cybersecurity risks had not "materially affected" the Company was misleading because the nation-state intrusion was ongoing at the time the 10-K was filed on November 18, 2024, had penetrated F5's systems approximately a year earlier, and the Company's deficient controls made such a material impact foreseeable. The claim of "regular testing and assessments to identify vulnerabilities" was inconsistent with the persistence of default and trivially guessable passwords on internal systems, the presence of compromised credentials on the dark web, and the public exposure of critical build infrastructure for over five years, all of which a competent vulnerability assessment would have identified and remediated. F5 itself admitted that its "controls were uneven – strong in some places and not in others," and subsequently implemented basic remedial measures that a company holding itself out as an industry security leader would have already had in place.

### G. False and Misleading Statements During F5's January 28, 2025 Q1 2025 Earnings Call

129. On January 28, 2025, F5 held a conference call with investors and analysts to discuss the Company's financial results for the first quarter of fiscal year 2025 (the "Q1 2025 Earnings Call"). Defendants Locoh-Donou and Werner participated in the call on behalf of the Company. During the Q1 2025 Earnings Call, Defendant Locoh-Donou touted the Company's cybersecurity capabilities, stating:

> Unlike competitors who invested solely in cloud or SaaS, or significantly reduced investment limiting their applicability in a multi-cloud world, over the last several years, F5 innovated across



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

> hybrid SaaS and next-generation software and hardware. ***As a result, we stand alone with the only complete hybrid multi-cloud portfolio for application security*** and delivery. ***We are the only player that can partner with a CIO or CISO to secure and deliver all of their applications and APIs across hybrid, multi-cloud environment***.
>
> We are differentiated across three primary vectors. ***First, F5 has the most effective and comprehensive application and API security platform in the industry***.

130. Defendant Locoh-Donou further represented that "***Customers are leveraging F5's complete security portfolio to protect their AI workloads, including BIG-IP, NGINX and F5 distributed cloud services***," and that "F5's WAP ***protect hybrid and multi-cloud applications with functionality that spans from API discovery to API security, which is essential for AI workloads***."

131. Also on January 28, 2025, in connection with the Company's Q1 2025 Earnings Call, F5 published a slideshow presentation. In a slide titled "***F5 stands alone with the only complete hybrid multicloud portfolio for app security*** and delivery," the Company stated "***F5 has the industry's most effective and comprehensive app and API security platform***."

132. The statements identified in ¶¶129-131 above were materially false and misleading when made. Defendants represented that F5 "stand[s] alone with the only complete hybrid multi-cloud portfolio for application security," that F5 was "the only player that can partner with a CIO or CISO to secure and deliver all of their applications and APIs," and that "F5 has the most effective and comprehensive application and API security platform in the industry." As detailed in Section IV.E, F5's internal cybersecurity controls were deficient for years and departed from industry standards and the Company's own guidelines. F5's BIG-IP build infrastructure was publicly exposed to the internet, lacked proper segmentation, ran end-of-life software, and used default or trivially guessable credentials. At the time of these statements, the nation-state intrusion of F5's BIG-IP product development environment was ongoing, having commenced in late 2023 and remained undetected, with the threat actor exfiltrating source code and undisclosed vulnerability information. Defendants' claim that F5



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

was the "only player" that could "partner with a CIO or CISO to secure and deliver all of their applications" was misleading because the Company was incapable of securing its own most critical internal systems. Any CISO partnering with F5 during this period would have been unknowingly entrusting their security to a company whose own systems were actively compromised by a nation-state actor. F5 itself subsequently admitted the Company lacked basic security measures such as adequate inventory and patch management, detection and response monitoring, zero-trust capabilities, and BIG-IP endpoint visibility.

### H. False and Misleading Statements During F5's April 28, 2025 Q2 2025 Earnings Call and in the Q2 2025 Earnings Release

133. On April 28, 2025, F5 held a conference call with investors and analysts to discuss the Company's financial results for the second quarter of fiscal year 2025 (the "Q2 2025 Earnings Call"). Defendants Locoh-Donou and Werner participated in the call on behalf of the Company. During the Q2 2025 Earnings Call, Defendant Locoh-Donou again represented that F5 "***has the most effective and comprehensive application and API security platform in the industry***."

134. During the question-and-answer portion of the call, Defendant Locoh-Donou discussed the AI opportunity in front of F5 as a catalyst for growth, stating "[s]o the AI opportunity when you look at it in aggregate, we're really happy with where we are. It so happened that the big challenges in AI are moving data and moving data securely. And ***we happen to have the best technology in the industry to move data securely and at real speed for customers***."

135. During the call, Defendant Locoh-Donou also stated F5's ADSP "***is the industry's only platform that fully converges high-performance load balancing and traffic management with advanced app and API security capabilities***," adding "there hasn't been any platform that delivers and ***secures all apps and APIs across hybrid and multi-cloud environments at scale until now***. With the F5's [sic] ADSP, we are enabling ***consistent policies***, ***full visibility,*** and AI-driven insights, all from a single platform that is flexible to deploy." Defendant Locoh-Donou



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

further stated "[w]e are delivering new capabilities that give ***CISOs the visibility, compliance, and protection they need to deliver and secure any app, any API, anywhere***."

136. Further touting the Company's security capabilities, Defendant Locoh-Donou stated "Just last week, ***we unveiled broad cybersecurity enhancements to the F5 ADSP. These enhancements significantly improve organization's ability to identify and remediate vulnerabilities and threats to AI and other modern applications***."

137. Also during the Q2 2025 Earnings Call, an analyst asked about the "largest opportunity from a dollar basis" among F5's AI use cases, and Locoh-Donou responded:

> Yes. That's a really important topic. We are -- the largest use case for us today in terms of where most – we're seeing most of the dollars is in data delivery for AI models. So this is where we are -- BIG-IP is typically actually in hardware is being inserted in front of beta stores to enable the rapid movement and ***secure movement of massive amounts of data between data stores and AI applications in training or in inferencing, frankly. So that is the, I would say, the lion's share of the opportunity today***.

138. Also on April 28, 2025, F5 published a press release discussing the Company's financial results for the second quarter of 2025, which was also filed with the SEC on Form 8-K (the "Q2 2025 Earnings Release"). Defendant Locoh-Donou was quoted in the Q2 2025 Earnings Release stating "***F5 alleviates the high costs, crushing complexity, and escalating cyber risks IT teams face in an AI-driven hybrid multicloud world***" and that F5 is "***delivering new capabilities that give CISOs the visibility, compliance, and protection they need to deliver and secure any app, any API, anywhere***."

139. The statements identified in ¶¶133-138 above were materially false and misleading when made. Defendants represented that F5 had "the most effective and comprehensive application and API security platform in the industry," "the best technology in the industry to move data securely," that F5's ADSP was "the industry's only platform that fully converges high-performance load balancing and traffic management with advanced app and API security capabilities," that F5 was "delivering new capabilities that give CISOs the visibility,



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

compliance, and protection they need," and that F5 had just "unveiled broad cybersecurity enhancements" that "significantly improve organization's ability to identify and remediate vulnerabilities and threats." As detailed in Section IV.E, F5's internal cybersecurity controls were deficient for years and departed from industry standards and the Company's own guidelines. F5's BIG-IP build infrastructure was publicly exposed to the internet, lacked proper segmentation, ran end-of-life software, and used default or trivially guessable credentials, while compromised development credentials circulated on the dark web. A nation-state threat actor had penetrated F5's corporate network in late 2023 and maintained persistent, undetected access to critical F5 systems. The representation that F5's platform provided "full visibility" and "consistent policies" was particularly misleading in light of F5's own subsequent admission that the Company lacked basic security measures such as adequate inventory and patch management, detection and response monitoring, zero-trust capabilities, and BIG-IP endpoint visibility. The assertion that F5 was improving organizations' ability to "identify and remediate vulnerabilities" was similarly misleading given that F5 had failed to identify and remediate its own critical vulnerabilities over a period of years. The nation-state intrusion remained ongoing and undetected at the time of these statements.

### I. False and Misleading Statements During the May 14, 2025 JPMorgan Conference

140. On May 14, 2025, F5 participated in the JPMorgan Global Technology, Media and Communications Conference. During the conference, Defendant Anand discussed how the Company's security capabilities act as a competitive differentiator, stating:

> What we've been focusing on is ***bridging both delivery and security together*** . . . What we've been able to do . . . is ***bridging a lot of the security use cases*** along with the load balancing and traffic management and that includes ***application security, API security, bot protection***, we really believe that the infusion of security and delivery is fundamentally important. So for us, we think that, that investment in ***building out that platform play is a core differentiator as it relates to our traditional competitors***.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

141. The statements identified in ¶140 above were materially false and misleading when made. Defendant Anand represented that F5's strategy of "bridging both delivery and security together" and "bridging a lot of the security use cases" with traffic management was a "core differentiator as it relates to our traditional competitors." As detailed in Section IV.E, F5's internal cybersecurity controls were deficient for years. The Company left software exposed to the internet and failed to follow the cybersecurity guidance it provided to customers. Its BIG-IP build infrastructure was publicly exposed to the internet, lacked proper segmentation, ran end-of-life software, and used default or trivially guessable credentials. At the time of these statements, a nation-state threat actor had been operating undetected inside F5's BIG-IP product development environment for approximately eighteen months, exfiltrating sensitive information such as source code. Defendants' statements that F5's "infusion of security and delivery" was a "core differentiator" was false and misleading because F5's own infrastructure lacked basic security protections and had been compromised by the very type of threat F5 purported to defend against. F5 itself admitted the Company lacked basic security measures.

### J. False and Misleading Statements During the June 4, 2025 Bank of America Global Technology Conference

142. On June 4, 2025, Defendants Werner and Fountain presented on behalf of F5 at the Bank of America Global Technology Conference 2025. During the conference, a securities analyst asked about the "competitive landscape" and how it is changing. In response, Defendant Fountain stated:

> Across a number of our security segments, I would describe it as competing with point solutions. So there are security vendors that have very strong offerings in individual security features. ***I think we feel very good about the security efficacy of the products that we have in each of those segments. So we go toe-to-toe with them, but there are a number of competitors there***. And then certainly, there are some, I'll call them platform type players like the public clouds who offer some basic functionality in a number of these areas that are really optimized for their environment. ***What I think really stands out is there's nobody who is able to operate across all these different deployment models. And so I think we're quite unique in the range of both functions that we're able to provide***



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

> ***and environments in which we are able to operate. And for the large organizations that we serve, large enterprise, service providers, governments, that's an absolute necessity. And so I think we stand out in a pretty unique way*.**

143. The statements identified in ¶142 above were materially false and misleading when made. Defendant Fountain represented that F5 felt "very good about the security efficacy of the products" it offered, that F5 could "go toe-to-toe" with security competitors, and that "there's nobody who is able to operate across all these different deployment models," making F5 "quite unique" for the large enterprises and governments it served. As detailed in Section IV.E, F5's internal cybersecurity controls were deficient for years. The Company left software exposed to the internet and failed to follow the cybersecurity guidance it provided to customers. Its BIG-IP build infrastructure was publicly reachable from the internet, lacked proper segmentation, ran end-of-life software, and relied on default or trivially guessable credentials. These deficiencies had enabled a nation-state threat actor to penetrate F5's network in late 2023 and maintain persistent, undetected access to the BIG-IP product development environment for approximately eighteen months, exfiltrating source code and other sensitive information. The claim that F5 could "go toe-to-toe" with dedicated security competitors was misleading given the Company's actual cybersecurity posture compared to peers. Industry participants criticized the Company's security capabilities after the Breach, with one noting that when comparable security companies experienced similar intrusions, their dwell times were measured in days, not years. ¶¶187-189. F5 itself subsequently admitted that it lacked basic security measures.

### K. False and Misleading Statements During F5's July 30, 2025 Q3 2025 Earnings Call and Q3 2025 Earnings Release

144. On July 30, 2025, F5 held a conference call with investors and analysts to discuss the Company's financial results for the third quarter of fiscal year 2025 (the "Q3 2025 Earnings Call"). Defendants Locoh-Donou and Werner participated in the call on behalf of the Company. During the Q3 2025 Earnings Call, Defendant Locoh-Donou represented that "F5's ***unique ability to deliver and secure every app, every API anywhere*** on premises, in the cloud, at the



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

edge and across hybrid multi-cloud environments is a ***significant competitive advantage***. It powered strong demand across both hardware and software deployment models in Q3." Defendant Locoh-Donou further represented that F5's "application delivery and ***security platform*** is ***the first in the industry, offering consistent policies, full visibility and AI-driven insights***." Defendant Locoh-Donou further stated "F5 ***delivers and secures every app and API anywhere***, on-prem, cloud, edge or hybrid environment, ***we lead in solving today's toughest business challenges***."

145. In connection with the Q3 2025 Earnings Call, F5 published a slideshow presentation. In a slide titled "The F5 Application Delivery and Security Platform," F5 stated it was "Providing customers the industry's premier platform" which was "***Built to put control without compromise into customers' hands, with fewer blind spots and stronger defenses for better business outcomes.***" The slide also stated that F5 provided "***Complete app*** delivery ***and security***." In another slide titled "F5 is delivering, scaling, securing and connecting AI applications," F5 stated "***F5 protecting AI applications, APIs, and models with F5 WAAP and AI Gateway. F5 prevents abuse, data leakage, and attacks like prompt injection***, while ensuring full visibility and control over how AI models and applications interact across environments."

146. Also on July 30, 2025, F5 issued a press release discussing the Company's financial results. The press release was filed with the SEC on Form 8-K (the "Q3 2025 Earnings Release"). In the Q3 2025 Earnings Release, Defendant Locoh-Donou stated the Company's "***strong top-line performance along with continued operating leverage, is a testament*** to our team's execution, our continued innovation, ***and the enormous trust the largest enterprises and service providers across the globe place in F5***."

147. The statements identified in ¶¶144-146 above were materially false and misleading when made. Defendants represented that F5's "unique ability to deliver and secure every app, every API anywhere" was a "significant competitive advantage" that "powered strong demand," that F5's platform was "the first in the industry, offering consistent policies, full



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

visibility and AI-driven insights," that F5 was "[p]roviding customers the industry's premier platform" "[b]uilt to put control without compromise into customers' hands, with fewer blind spots and stronger defenses," and that the Company's "strong top-line performance" was "a testament" to the "enormous trust the largest enterprises and service providers across the globe place in F5." As detailed in Section IV.E, F5's internal cybersecurity controls were deficient for years. The Company left software exposed to the internet and failed to follow the cybersecurity guidance it provided to customers. Its BIG-IP build infrastructure was publicly exposed to the internet, lacked proper network segmentation, ran end-of-life software, and used default or trivially guessable credentials. A nation-state threat actor had penetrated F5's corporate network in late 2023 and maintained persistent, undetected access to the BIG-IP product development environment for approximately two years, exfiltrating source code and undisclosed vulnerability information. The assertion that F5 provided "fewer blind spots and stronger defenses" was contradicted by these control deficiencies and the two-year undetected dwell time of a nation-state intruder, the very definition of a blind spot. The claim that the Company's results reflected the "enormous trust" placed in F5 by global enterprises was misleading because that trust rested on security representations that were materially at odds with the Company's actual cybersecurity posture. F5 itself subsequently admitted that it lacked basic security measures.

148. Furthermore, by the time Defendants made the statements identified in ¶¶144-146 above, Sygnia publicly reported that a Chinese state-sponsored espionage group had been exploiting vulnerabilities in both VMware and F5 BIG-IP products since early 2025 to maintain persistent access to victim networks. ¶64. The hackers originally accessed F5's systems through VMware.

**L. False and Misleading Statements During the September 9, 2025 Goldman Sachs Conference**

149. On September 9, 2025, F5 participated in the Goldman Sachs Communacopia & Technology Conference. Importantly, this conference took place one month after F5 admittedly discovered the Security Breach and three days before the Department of Justice granted the



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

disclosure-delay request. Defendants Locoh-Donou and Werner participated in the conference on behalf of the Company. During the conference, with knowledge of the active and ongoing nation-state intrusion of F5's BIG-IP product development environment, Defendant Locoh-Donou made several affirmative representations highlighting the Company's security capabilities. For example, Defendant Locoh-Donou stated the "***very deep granular inspection of traffic is what makes ADCs a very unique category.*** And essentially, is why ADCs have been placed by customers right next to their application, and ***we control 100% of the traffic that is going into our customers' mission-critical applications***."

150. During the conference, a securities analyst asked about the Company's security offering, leading to the following exchange:

> **Question**: Could we just talk a little bit about security. I mean the company has, I think, increasingly been incorporating and investing in security capabilities across its entire portfolio. And I think, last year, security represented about 41% of revenue. Why is F5 well positioned to address application security when you think about security as an umbrella? Which facets of security does F5 compete in most aggressively?
>
> **Answer**: So the – I'm going to go back to what I said earlier, that we – ***ADCs control 100% of the traffic going into mission-critical applications.*** Originally, our customers use that – the ADC capability, this very granular inspection of application traffic. They use it primarily to keep the applications performing and to keep them available. ***But over time, customers have realized that, that place of inspection was an ideal place to also secure applications, protect them before attacks, reach the applications or the database behind the application. And so F5 has been in security now for over a decade, primarily from this place of inspecting traffic very granularly and securing applications***.
>
> ***Today, application delivery and security have converged. You cannot really separate performance of an application from the application being secure. And that makes F5 absolutely critical to all application security.***
>
> ***Now where we do that today is in three places. First is, we secure the front end of all applications and APIs with our – what we call***



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

> ***our WAP portfolio, which is web application API protection. So we secure the front end of applications with those solutions in also in hardware, software or SaaS.***
>
> ***Two is, we also secure users in the workforce by securing their access with our Zero Trust Access solution, securing their access to applications.*** And increasingly, we're bringing our capabilities to securing the new AI stack. And so we – these – if you think about it in AI, ***securing AI basically requires securing every token. And that is more of a layer 7 capability, and that's where F5 shines***.

151. In response to a question about how F5 is uniquely situated to address complex customer issues, Defendant Locoh-Donou stated that F5 had made "a strategic choice several years ago to remain ***entirely focused on application and API*** delivery and ***security***," and that this strategic positioning made F5 "***very well positioned to address***" customer needs, including "***API security. You need securing against bot attacks, as an example***."

152. During the same conference, Defendant Locoh-Donou stated "[a]nd when you look at the complexity that customers are facing what I call the ball of fire earlier, having a single platform that you can go to and say, I'm going to have a single place from which I can see how ***I'm securing all of my applications across all clouds. I'm securing all of my APIs across all cloud environments. It's a pretty powerful proposition***." Defendant Locoh-Donou also described "how I view the – our competitors in the traditional ADC market. But we have competitors in Software-as-a-Service. ***We have competitors that come more from a cloud offering in security, in particular***. We have competitors in each of these categories. ***But where we are unique is in our ability to bring all of that under a single platform that can be delivered in multiple form factors, but it's a single platform. And that's where we don't really have competition today***."

153. The statements identified in ¶¶149-152 above were materially false and misleading when made, and their falsity is particularly egregious because they were made while Defendants had actual knowledge of the Security Breach. F5 purportedly detected the nation-state intrusion on August 9, 2025, one month before the September 9, 2025 Goldman Sachs



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

conference. Despite this knowledge, Defendant Locoh-Donou affirmatively represented that F5 "control[s] 100% of the traffic going into mission-critical applications," that F5 was "absolutely critical to all application security," that F5 "secure[s] the front end of all applications and APIs" and "secure[s] users in the workforce," that "we also secure users in the workforce by securing their access with our Zero Trust Access solution," and that F5 had "a single platform" for comprehensive security where "we don't really have competition today." As detailed in Section IV.E, F5's internal cybersecurity controls were deficient for years. The Company left software exposed to the internet and failed to follow the cybersecurity guidance it provided to customers. F5's BIG-IP build infrastructure was publicly exposed to the internet, lacked proper network segmentation, ran end-of-life software, and used default or trivially guessable credentials. These deficiencies had enabled a nation-state threat actor to penetrate F5's corporate network in late 2023 and maintain persistent access to the BIG-IP product development environment, exfiltrating source code and undisclosed vulnerability information. F5 itself subsequently admitted the Company lacked basic security controls. Defendant Locoh-Donou's statements touting F5's competitive positioning were particularly misleading as after the Breach, industry participants criticized the Company's security posture, including in comparison to peers, with one noting F5's inferior "security culture, tooling, and operational maturity." ¶¶181-187.

**M. False and Misleading Statements in F5's September 11, 2025 Form 8-K**

154. On September 11, 2025, in a press release announcing F5's intent to acquire CalypsoAI, which was also filed with the SEC on Form 8-K, Locoh-Donou stated: "AI is redefining enterprise architecture – and the attack surface companies must defend," and "Traditional firewalls and point solutions can't keep up. The addition of CalypsoAI will give enterprises the confidence to innovate faster and better protect critical data ***as they rely on F5 to deliver and secure apps, APIs, and AI models across their environment***."

155. The same press release described F5 as "***the global leader that delivers and secures every app.*** Backed by three decades of expertise, ***F5 has built the industry's premier***



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

***platform*** – F5 Application Delivery and Security Platform (ADSP) – ***to deliver and secure every app, every API, anywhere: on-premises, in the cloud, at the edge, and across hybrid, multicloud environments***."

156. The statements identified in ¶¶154-155 above were materially false and misleading when made. With knowledge of the Security Breach, Defendants described F5 as "the global leader that delivers and secures every app" and stated that F5 had "built the industry's premier platform" to "deliver and secure every app, every API, anywhere." As detailed in Section IV.E, F5's internal cybersecurity controls were deficient for years. The Company left software exposed to the internet and failed to follow the cybersecurity guidance it provided to customers. Its BIG-IP build infrastructure was publicly exposed to the internet, lacked proper segmentation, ran end-of-life software, and used default or trivially guessable credentials. These deficiencies had allowed a nation-state threat actor to penetrate F5's network in late 2023 and maintain persistent access to the BIG-IP product development environment, exfiltrating source code and undisclosed vulnerability information. F5 itself subsequently admitted it lacked basic security controls. These representations were also false and misleading because they were made with actual knowledge of the Security Breach.

## VI. THE TRUTH IS REVEALED

### A. First Partial Corrective Disclosure – October 15, 2025

157. The truth began to be revealed on October 15, 2025, when Defendants published a Form 8-K (the "October 15 Form 8-K") and disclosure statement announcing the Security Breach that they had purportedly uncovered more than two months prior to the public disclosure. F5 revealed that on August 9, 2025, the Company learned that "a highly sophisticated nation-state threat actor had gained unauthorized access to certain Company systems." The Company further acknowledged that the threat actor had "***maintained long-term, persistent access to certain F5 systems***, including the BIG-IP product development environment and engineering knowledge management platform," and that "***certain files were exfiltrated, some of which***



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

***contained certain portions of the Company's BIG-IP source code and information about undisclosed vulnerabilities that it was working on in BIG-IP***." F5 additionally disclosed that "some of the exfiltrated files from our knowledge management platform contained configuration or implementation information" for certain customers. This disclosure confirmed that the breach extended beyond F5's own internal systems and directly compromised customer-specific configuration and implementation data. This information would further assist an attacker in crafting additional cyber-attacks on F5 customers.

158. The October 15 Form 8-K further disclosed that, on September 12, 2025 – more than a month after F5 uncovered the Breach – the DOJ determined under Item 1.05(c) that F5 could delay disclosing the Breach, despite the requirement that F5 "disclose any cybersecurity incident they experience that is determined to be material" "***within four business days*** of determining an incident was material."[21]

159. Concurrently, the October 15 Form 8-K also announced the creation of an entirely new C-suite position focused on security, underscoring the severity of the Security Breach and contradicted Defendants' prior assurances that F5 already maintained best-in-class security capabilities. As F5 explained, effective October 9, 2025, Board member Michael Montoya would be resigning from F5's Board of Directors to take on the role as F5's Chief Technology Operations Officer. Reporting directly to CEO Locoh-Donou, Montoya would now be tasked with leading "the enterprise-wide strategy and execution to build and operate the Company with security at its core."

160. The same day, on October 15, 2025, CISA issued a press release titled "CISA Issues Emergency Directive to Address Critical Vulnerabilities in F5 Devices," stating "Nation-

---

[21] SEC rules state that "[r]egistrants must disclose any cybersecurity incident they experience that is determined to be material," adding "[a]n Item 1.05 Form 8-K must be filed within four business days of determining an incident was material. A registrant may delay filing as described below, if the United States Attorney General … determines immediate disclosure would pose a substantial risk to national security or public safety." However, SEC and DOJ guidelines suggest that the delay provision is limited and it does not give registrants a free pass to mislead investors outside of the Item 1.05 context. *See* Section VIII.C below.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

State Cyber Threat Actor Poses Immediate Risk to Federal Networks." The press release explained that CISA "has identified a significant cyber threat targeting federal networks utilizing certain F5 devices and software. A nation-state cyber threat actor poses an imminent risk, with the potential to exploit vulnerabilities in F5 products to gain unauthorized access to embedded credentials and Application Programming Interface (API) keys," adding "Such exploitation could allow the threat actor to move laterally within an organization's network, exfiltrate sensitive data, and establish persistent system access, potentially leading to a full compromise of targeted information systems."

161. Commenting on the Security Breach, CISA's Acting Director acknowledged the severity of F5's security failures, stating "***[t]he alarming ease with which these vulnerabilities can be exploited by malicious actors demands immediate and decisive action***. These same risks extend to any organization using this technology, ***potentially leading to a catastrophic compromise of critical information systems***."

162. Financial publications and industry sources were quick to react to the news, highlighting the severity of the situation caused by F5's security failures. For example, Rapid7, which describes itself as "a global leader in AI-powered managed cybersecurity operations" stated that "the compromise of internal development systems represents a ***long-tail risk***. Adversaries with access to proprietary source code or vulnerability research may attempt to identify latent weakness in future operations." Ars Technica published a report titled "Thousands of customers imperiled after nation-state ransacks F5's network," noting that "Control of the build system and access to the source code, customer configurations, and documentation of unpatched vulnerabilities has the potential to give the hackers ***unprecedented knowledge of weaknesses and the ability to exploit them in supply-chain attacks on thousands of networks, many of which are sensitive***."

163. The market reacted negatively to the revelation of F5's security failures and the severity of the Breach. On October 15, 2025, F5's stock price declined from its prior closing



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

price of $343.17 per share to $330.75 per share, a decline of approximately 3.6%. F5's stock price continued to decline the next day – plummeting an additional $35.40 per share to close at $295.35 per share on October 16, 2025, a single-day decline of approximately 10.7% – as news reports attributed the breach to a threat actor linked to China and securities analysts digested the implications of the breach for F5's business and customer relationships. Over the course of two trading days, the Company's stock price declined $47.82 per share, or approximately 13.9%.

164. Securities analysts reacted negatively to the news. RBC Capital Markets issued a research note on October 16, 2025 observing that, while F5 claimed to have contained the breach and was engaged with federal law enforcement, "***our worry is the unknown impacts given the long-term access by the threat actor to undisclosed vulnerabilities along with the BIG-IP development environment***." CFRA reported that "government-backed hackers had long-term, persistent access to [F5's] network, which allowed them to steal its source code and customer information." And despite F5's two month delay in disclosing the breach, CFRA noted that "[b]eyond high-level details, not much is known about who is behind the attack or what the fallout from the attack will be."

165. On October 18, 2025, *Bloomberg* published an article titled "Hackers Had Been Lurking in Cyber Firm F5 Systems Since 2023." Reporting on the severity of F5's security failures, *Bloomberg* reported "[t]he state-backed hackers who breached cybersecurity company F5 Inc. broke in beginning in late 2023 and lurked in the company's systems until being discovered in August of this year, according to people who were briefed by F5 about the incident." "The attackers penetrated F5's computer systems by exploiting software from the company ***that had been left vulnerable and exposed to the internet***, according to the people. ***F5 told customers that the hackers were able to break in after the firm's staff failed to follow the cybersecurity guidelines it provides customers*** . . . ." The article also connected the Company's stock price decline on October 16 to disclosures of the Security Breach.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

166. On October 22, 2025, F5 published a post on its website titled "Lessons we are learning from our security incident." F5's was authored by F5's CISO Christopher Burger. The post stated that F5 "take[s] full ownership of" the "major security incident" it disclosed on October 15. The post further admitted: "***Our controls were uneven – strong in some places and not in others***." Defendants explained that F5 needed to "restor[e] trust" and "rais[e] the security bar," explaining that in response to the Breach: "We have improved automation in our inventory and patch management, and strengthened our monitoring for detection and response. We are enhancing our zero-trust capabilities across our infrastructure and operations, and we are partnering with CrowdStrike to bring advanced endpoint visibility to F5 BIG-IP. In fact, we are running CrowdStrike EDR on our corporate edge BIG-IP devices. We're also offering that same protection to our customers for their BIG-IP fleets."

167. The Company's October 22 post states that F5's own "configuration guidance" specifies "that management interfaces should never be exposed to the public Internet and should always be protected through proper segmentation, network isolation, and access control." The October 22 post asserts: "we have no knowledge of undisclosed critical or remote code execution vulnerabilities, or exploitation of the vulnerabilities we disclosed last week." The notion that the Breach did not involve "critical or remote code execution vulnerabilities," was incorrect (*see* ¶¶192-194 below).

168. And acknowledging that it lacked a "bug bounty" program – a widely adopted security strategy used by many corporate entities such as Microsoft, Facebook, and Google, as well as governments such as the European Union and the U.S. federal government – F5 announced that "In the coming weeks, we ***will also launch*** a bug bounty program to further strengthen product security."

169. The post further states: "The affected customer data we have found is primarily internal notes about customer interactions, which can include information used for trouble shooting, feature development, and bug fix requests." This is significant because it shows the



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

exfiltrated data could provide a threat actor with customer-specific intelligence to craft targeted attacks.

**B. Second Partial Corrective Disclosure – October 27, 2025**

170. Then, on October 27, 2025, after the market had closed, F5 issued a press release that was also filed with the SEC on Form 8-K, containing the Company's fourth quarter fiscal year 2025 earnings results (the "Q4 2025 Earnings Release").

171. In its Q4 2025 Earnings Release, Defendants revealed dramatically reduced revenue and growth expectations for fiscal year 2026: total revenue growth of just 0% to 4%, a reversal from the mid-single-digit revenue growth that Defendants stated their "current pipeline" supported. It was also a material departure from the trajectory of the Class Period during which Defendants had repeatedly raised FY25 revenue guidance, from an initial 4% - 5% at the start of the Class Period, to an increased 6% -7% in January 2025, to 6.5% - 7.5% in April 2025, and finally to approximately 9% in July 2025, which the Company reiterated on July 30, 2025. The Company further guided first quarter fiscal year 2026 revenue to a range of $730 million to $780 million, below the prior consensus estimate of approximately $794 million, and non-GAAP earnings per share of $3.35 to $3.85, well below the prior market estimate of approximately $4.04.

172. In connection with the Q4 2025 Earnings Release, F5 held a conference call with investors and analysts to discuss the Company's financial results for the fourth quarter and fiscal year 2025 (the "Q4 2025 Earnings Call"). During the call, Defendant Locoh-Donou disclosed the specific mechanisms by which the Security Breach was expected to damage F5's business, stating that F5 "anticipate[s] some near-term disruption to sales cycles as customers focus on assessing and remediating their environments." The Company outlined three categories of harm: (1) diversion of F5's own field and sales resources from normal selling activities to customer remediation and breach response; (2) delayed client decisions as customers exercised heightened caution and scrutiny over new projects in the wake of the incident; and (3) project deferrals and



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

cancellations, as a subset of customers elected not to proceed with certain projects in the near term.

173. Questioning the magnitude of the impact caused by the Breach, a securities analyst asked: "Could you just tell us what percentage of the revenue comes from BIG-IP?" Avoiding quantifying the potential impact, Defendant Werner acknowledged the severity of Breach on F5's business, stating "We don't break out our product by revenue line. We're a single-segment company, but it's – ***BIG-IP is the highest revenue product, of course***, but we don't actually break out what the contribution is." Defendant Werner also stated, "we've learned a lot in the last several weeks."

174. And seeking clarification on the scope of the breach, a securities analyst inquired: "maybe you could clarify because you've got BIG-IP as the appliance system business, but you have virtual additions of BIG-IP. So when you talked about the breach, you said it affected BIG-IP. Does that mean that the breach affects both software and hardware equally?" In response, Defendant Locoh-Donou confirmed, "[y]es it does."

175. Defendant Locoh-Donou's confirmation that the breach affected both the software and hardware of BIG-IP, and not only a limited software environment is significant as having intimate access to software repositories, hardware design materials, development pipelines, and developer environments creates the same type of risk that happened in the SolarWinds cyberattack, where trusted software was tampered with during the development and delivery process.

176. Defendant Locoh-Donou also acknowledged the impact the security failures and resulting Breach had on F5's customers, stating, "[w]e are . . . very aware as a team and as a company of the burden that this has placed in our customers who have had to work long hours to upgrade" affected products. "Given the visibility that this security incident has had, it would be natural that, in some of our customers at an executive level, we may see some delays of approvals or delays of deals."



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

177. The market reacted negatively to the Company's additional disclosures. On October 28, 2025, the first full trading day following the after-hours news release, F5's stock price fell 7.9% from its closing price of $290.41 per share on October 27 to close at $267.58 per share. The decline continued on October 29, 2025, as the stock fell further by $8.82 per share to close at $258.76 per share. Over the two-day period following the earnings release, F5's stock declined approximately 10.9% from its October 27 closing price.

178. Understandably, analysts reacted negatively to the Company's disclosures. Needham & Company downgraded F5 stock citing the "security breach" and "an increased risk of deal push-outs," adding that F5's "momentum . . . appears stalled" due to the Security Breach. J.P. Morgan lowered its price target to $295 from $320, explaining that "the biggest focus on the earnings call and relative to the outlook shared by management was the recent security breach, which has led F5 to take corrective measures to ensure protection of customer environments." J.P. Morgan further highlighted the disappointing guidance: "given the resources diverted to addressing customer needs as well as the potential ramifications in terms of customers delaying / pausing projects against the backdrop of this breach, F5 is embedding significant conservatism in its guide for F1H26 with expectations of potential revenue impact across both Hardware and Software." Morningstar, Barclays, and William Blair issued similar reports.

179. Similarly, Morningstar lowered its fair value estimate for F5 from $335 to $280, stating that "the firm's recent security incident will weigh on customers' decisions to buy F5 products and solutions, with the firm's brand potentially being maligned by the negative press around the breach," and drawing pointed comparisons to other companies that had experienced cyber breaches: "we have seen with other companies such as Okta and SolarWinds that cyber breaches are usually followed by a dramatic slowdown in sales growth as customers choose to shop elsewhere."

180. Wolfe Research reported that F5 was "Stealing Defeat from the Jaws of Victory … F5's security breach is so disappointing," outlining a "Worst Case" scenario for F5 beyond



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

stalled growth and a loss of customers, stating, "Armed with source code from F5, the nation-state hacker could exploit as-yet undiscovered vulnerabilities they find in F5's source code – and exfiltrate information/data from F5's customers."

## VII. POST-CLASS PERIOD DEVELOPMENTS

181. On October 29, 2025 Deep Specter, a cybersecurity intelligence and advisory group published a report titled "F5 Is Misleading the Market – The Breach Is Nowhere Near Contained" (the "Deep Specter Report").[22] The Deep Specter Report concluded that, contrary to Defendants' statements, "[t]he breach was deep, long-lasting, and touched F5's core infrastructure." The Deep Specter Report further stated that "[n]ation-state actors had unrestricted access for over a year, compromising source code, credentials, and product integrity."

182. The Deep Specter Report asserted that "F5's claim that some vulnerabilities are *not critical* is inaccurate" and that a "[r]eview of documentation shows ***multiple vulnerabilities should be classified as 'critical'*** due to their business impact." Subsequent developments are consistent with these concerns. For example, in late March 2026, F5 reclassified CVE-2025-53521, which had been initially disclosed in October 2025 as a denial-of-service flaw with a CVSS score of 7.5, as a remote code execution vulnerability carrying a CVSS score of 9.8, a "critical" severity rating. *See* ¶¶192-194, below. The reclassification was a steep upgrade in severity, with one publication stating the problem went from "a minor technical glitch" to "a major threat."

183. More importantly, the Deep Specter Report concluded that F5's Breach did not result from a single incident of misfortune but rather "***years of negligence in its IT and cyber security operations, essentially leaving the door open for attackers***." The Report stated that its

[22] Deep Specter describes itself as "a cybersecurity intelligence and advisory group founded by a rare blend of nation-state-level offensive experts and multinational public company executives. We operate at the intersection of deep technical capability and high-level business strategy - understanding cybersecurity not only from the attacker's perspective, but also from the boardroom's."



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

"deep technical analysis of F5's security posture" found the Company has had "technical compliance" problems "for years," was "using core technologies" which are "end of life inside their products," and concluded that "***the BIG-IP breach was not just a misfortunate situation, but rather the outcome of years of negligence***."

184. The Deep Specter Report further stated that F5's "outsourced code review seems designed to downplay findings and reassure the market with empty statements" and that "[w]hat's called a resolution is really information control, not threat containment." The Report concluded that F5's "***subsequent framing of the incident as a 'nation-state attack' serves primarily as a crisis communications tactic to minimize its negligence in protecting its product***."

185. Deep Specter also stated "[b]ased on our research, we are confident that ***F5's IT infrastructure has consistently demonstrated noncompliance with even minimal security standards***, revealing ***systemic negligence in IT governance, product development oversight, and regulatory compliance***."

186. On October 30, 2025, *Seeking Alpha* published an article titled "F5: Reputational Damage Is Too Much." Discussing the Security Breach, the article stated, "[t]he reputational damage is huge, and I am not certain FFIV can ever recover its reputation with customers." Further discussing the breach, the article stated, "[***t]he most important and damaging development is the security incident in October 2025, which compromised portions of FFIV's core BIG-IP source code***. This affected both hardware and virtual software deployments," adding "the damage is done, and in fact, it is unquantifiable at the moment since the longer-term implications of a source code breach are just not possible to quantify today. Who knows what the attacker could do with the source code? Is FFIV going to revamp its entire source code? I don't think so. ***The damage is lasting and structural, in my opinion, as this really hurt FFIV's reputation, which is literally (I consider) the most important attribute for a cybersecurity company***."



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

187. On November 9, 2025, Packets & Principles, wrote an article titled "Migrating a Public Web App from F5 BIG-IP to Cloudflare."[23] The article discussed the Security Breach, stating "F5 announced a security incident that should ***concern anyone running critical infrastructure on their platforms.*** The attackers had maintained access for approximately two years before detection. ***Two years. For a vendor whose products sit at the security perimeter of thousands of enterprises, that dwell time is staggering***." The article continued to criticize F5, stating "[c]ompare that to how Cloudflare handled similar incidents. On October 18, 2023, Cloudflare discovered that Okta (their internal employee identity provider) had been compromised before Okta did and worked to rotate keys that may have been compromised. When the attacker started using non-rotated credentials to establish persistence in Cloudflare's Atlassian environment during Thanksgiving 2023, ***Cloudflare detected and removed the attacker's access quickly. Their dwell time was measured in days, not years. The difference isn't luck. It's a fundamental difference in security culture, tooling, and operational maturity***." The post further stated "those of us who make decisions about products, services, and software need to constantly be evaluating those solutions and replacing them with more secure alternatives if the solutions don't keep pace as attackers grow more advanced. ***When your WAF vendor becomes a weak point in your security posture, it's time to reassess***."

188. Packets & Principles further stated, "***Legacy Network Vendors Are Becoming Security Liabilities***," adding "F5 and similar vendors were born in an era when network security meant hardware appliances in your data center inspecting packets as they passed through. They were genuine innovators in their time. But the world has changed faster than they have." The article continued, stating:

> These vendors have increasingly shifted from building their own technology to assembling it from commodity parts. They source

[23] Packets and Principles is a blog dedicated to exploring the world of computer networking and network architecture, written by Jason Tally, who describes himself as a network architect with a passion for understanding how the Internet and other complex networks function under the hood.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

> network processors from Cavium, Marvell, Broadcom, Intel, or MediaTek. They outsource design to contract studios and manufacturing to ODMs. They run decade-old versions of Linux and other open source software, often mixing in licensed software from companies like IP Infusion. This lets them ship "new features" faster on paper, ***but it has transformed them from technology companies into marketing companies that happen to sell network security equipment. When a security vendor's own product becomes a security risk, it's a sign they've lost the plot. The F5 breach isn't an isolated incident. It's a symptom of an industry-wide shift away from deep technical ownership toward higher margins on integrated commodity components***.

189. On November 10, 2025, CyberScoop published an article titled "What's left to worry (and not worry) about in the F5 breach aftermath," reporting that the "source code theft is most concerning because attackers can comb through it to identify or develop zero-day exploits." Security researchers quoted in the article described the source code theft as "***a longer term and more significant supply chain risk that we might only understand the consequences of further down the line***."

190. In the aftermath of the Security Breach, analysts became increasingly worried about F5's prospects. For example, on November 13, 2025, Morgan Stanley issued a report stating, "[a] reseller we spoke to today now sees potential for the breach to impact FQ2 results given customer concern around severity of breach that is slowing deal pipeline," adding that investors "initially anticipat[ed] minimal disruption" to Q2 results.

191. On January 5, 2026, Seeking Alpha published an article titled "F5: Questioning The Security Of This Security Provider," which observed that F5's cybersecurity incident continued to weigh on the Company's valuation and investor sentiment. The article noted that the "issue" with F5 stock "is that shares lost about a hundred dollars [per share]" and "nearly $6 billion [in market capitalization] in just two months' time, following a cybersecurity incident this fall. ***That is a major deal for a company whose products and services involve security***, as its substantial impact is obvious in the outlook for 2026, calling for flattish sales and earnings declines."



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

192. On March 27, 2026, the severity of the Security Breach was upgraded to reflect its critical nature. On March 27, 2026, F5 re-categorized CVE-2025-53521 as a remote code execution ("RCE") vulnerability with a CVSS score of 9.8, a ***critical severity rating***. F5 disclosed indicators of compromise associated with exploitation activity, including the deployment of malicious software and web shells on compromised BIG-IP systems.[24] The vulnerability had originally been disclosed on October 15, 2025, the day the Security Breach was announced, and was characterized at that time as a denial-of-service ("DoS") flaw with a CVSS score of 7.5. Also on March 27, CISA added the vulnerability to its Known Exploited Vulnerabilities ("KEV") catalog, "based on evidence of active exploitation" in the wild.

193. An RCE vulnerability is a severe security flaw that can allow an attacker to execute commands or code on a target system remotely rather than needing physical or local access. That is why RCE is typically treated as a critical security flaw.

194. Cyber Magazine published an article titled "Why F5's BIG-IP APM Flaw Results in 'Cybersecurity Roulette.'" The article states "[i]nitially disclosed with a lower severity and remediated as a denial-of-service (DoS) issue, the vulnerability has now been reclassified by F5 as an unauthenticated RCE issue. In simple terms, this means an attacker does not need valid login credentials to exploit the flaw. Instead, carefully crafted malicious traffic sent to a vulnerable system can trigger execution of arbitrary code." The article further stated: "[t]his type of vulnerability is particularly dangerous because it can allow attackers to gain control of affected systems, deploy malware or move laterally across networks." The article also quotes a cybersecurity executive describing the situation as "***cybersecurity roulette***," stating: "F5 just reclassified what was supposed to be a DoS bug into a full-blown RCE (CVE-2025-53521) – because apparently attackers decided to demonstrate its true potential by dropping webshells on unpatched devices." Help Net Security reported on March 28, 2026, that the Dutch National

---

[24] A web shell is malicious code installed on a compromised web server that allows attackers to remotely control the system and maintain unauthorized access.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

Cyber Security Center had "observed that this vulnerability has been abused." Hackread stated that "***Originally, the issue was dismissed as a minor technical glitch, but it has been re-categorised as a major threat***." The article stated the vulnerability was originally thought of as "merely a Denial-of-Service problem, an attack that simply crashes a system. However, further probing revealed a much more dangerous reality; the flaw is actually a memory-handling error that lets attackers bypass security entirely to plant malicious software."

## VIII. ADDITIONAL INDICIA OF DEFENDANTS' SCIENTER

195. The allegations set forth above give rise to a strong inference that Defendants acted with scienter, that they either knew, or were deliberately reckless in not knowing, that their statements regarding F5's cybersecurity capabilities and controls were materially false and misleading when made, and omitted to disclose material information necessary to make the statements made not misleading. This inference is supported by the following facts, considered both individually and holistically.

### A. Cybersecurity and BIG-IP Were at the Core of F5's Operations

196. The Individual Defendants' knowledge of, or deliberate recklessness regarding, the false and misleading nature of their cybersecurity representations is supported by the oversized importance of cybersecurity and F5's flagship BIG-IP to the Company's operations. Cybersecurity was one of the Company's key marketing identities and differentiators, a principal driver of its growth narrative, and an important topic for F5 investors. More importantly, F5's cybersecurity capabilities and expertise were of critical importance to F5's customers. As alleged above, Defendants consistently identified security as a key demand driver for F5's products. For example, Defendant Werner stated at the November 2024 RBC conference that "security remains of paramount concern, especially in the federal government" and that "security will continue to be a big driver of demand" for F5's products. The Company's annual reports, investor presentations, SEC filings, and other investor communications positioned cybersecurity as central to F5's value proposition.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

197. Moreover, as Defendants stated on October 27, 2025, BIG-IP, the very product whose development environment and source code were compromised in the Security Breach, is F5's highest-revenue product line. Because of BIG-IP's outsized contribution to F5's financial performance, and because BIG-IP sits at the network edge inspecting all traffic flowing into mission-critical applications, the security and integrity of BIG-IP's source code, configuration data, and vulnerability information were matters of paramount importance to F5's business. Senior executives responsible for the Company's flagship, highest-revenue product necessarily had, or should have had, intimate knowledge of the cybersecurity controls governing that product. The notion that the Individual Defendants, each of whom held himself out as knowledgeable about F5's security posture and each of whom communicated detailed claims about F5's security capabilities to investors, were unaware of deficiencies in the Company's cybersecurity controls protecting their most important product is not plausible.

198. Furthermore, security revenue represented a significant portion of the Company's revenues. For example, on October 28, 2024 Defendants stated "This year, our total security revenue, which includes stand-alone security, attached security and security related to maintenance revenue, was approximately $1.1 billion or 41% of total revenue. Stand-alone security revenue totaled $460 million, representing 36% of product revenue." For 2025, Defendants told investors on October 27, 2025, that "[t]his year, our total security revenue, which includes standalone security, attached security, and maintenance revenue related to security, grew 6% to approximately $1.2 billion or 39% of total revenue. Standalone security revenue totaled $463 million, representing 31% of product revenue."

199. As the Company's CEO, CFO, Chief Technology and AI Officer, and COO, respectively, Defendants Locoh-Donou, Werner, Anand, and Fountain occupied the most senior positions at F5 and had access to all material non-public information about the Company's cybersecurity posture.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

200. During the Class Period, F5 maintained a formal escalation path for reporting incidents or vulnerabilities to senior management. Incidents and vulnerabilities beneath a certain threshold were handled by the information security operations team. When issues rose above that threshold, they were escalated to the CISO, who would then distribute them to the C-Suite as he saw fit.

201. According to the Company's 2025 Proxy Statement filed on January 27, 2025, F5's "***management specifically identifies potential cybersecurity risks***," in connection with security reviews with F5's Board of Directors. Defendant Locoh-Donou has served on the Board since 2017. Providing further detail on this topic, under the heading "Cybersecurity Risk Oversight" the 2025 Proxy Statement stated:

> In conjunction with the Company's enterprise risk management processes, ***management specifically identifies potential cybersecurity risks and threats associated with the Company's business and discusses those risks and mitigation efforts as part of its quarterly reviews with the Risk Committee and periodically with the full Board. As a part of this process, the Company's Chief Information Security Officer provides periodic updates to the Risk Committee on cybersecurity related topics, including cyber threats to the Company and the status of the Company's cybersecurity posture and risk mitigation efforts.*** In addition, pursuant to the Company's Cyber Incident Response Plan, certain cyber related incidents are escalated to the Chair of the Risk Committee or Chair of the Board or full Risk Committee or Board when appropriate.

**B. The Nature, Duration, and Severity of the Breach are Provide Additional Indicia of Defendants' Scienter**

202. The nature, duration, and severity of the Security Breach itself support a strong inference of scienter. As F5 disclosed on October 15, 2025, a "highly sophisticated nation-state threat actor" had "maintained long-term, persistent access to" the Company's BIG-IP product development environment and engineering knowledge management platforms. According to *Bloomberg*, the attackers broke into F5's systems beginning in late 2023 and maintained access to F5's systems for approximately two years before discovery in August 2025. The incredible



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

duration of the intrusion, approximately two years of undetected, persistent access to the Company's most sensitive product development systems is itself powerful evidence of the deficiency of F5's cybersecurity controls and the recklessness of Defendants' contemporaneous statements highlighting F5's cybersecurity capabilities. For example, Packets & Principles wrote that "[f]or a vendor whose products sit at the security perimeter of thousands of enterprises" a "dwell time" of "two years" is "***staggering***," noting that when other security companies experience similar incidents, the "dwell time was measured in days, not years. ***The difference isn't luck. It's a fundamental difference in security culture, tooling, and operational maturity***." F5 eventually learned of the Breach from questions posed by the FBI.

203. Critically, reporting from Bloomberg, F5's own admissions, and forensic evidence indicate that the breach resulted not from the overwhelming sophistication of the attacker alone, but from F5's failure to maintain adequate internal controls. These disclosures, combined with the Company's significant remedial measures, further underscored the large gap between F5's public representations and its internal reality.

204. On October 18, 2025, Bloomberg reported "[t]he attackers penetrated F5's computer systems by exploiting software from the company that had been left vulnerable and exposed to the internet" and that "F5 told customers that the hackers were able to break in after the firm's staff failed to follow the cybersecurity guidelines it provides customers."

205. F5 CISO Christopher Burger further confirmed the inadequacy of F5's controls in his October 22, 2025 post titled "Lessons we are learning from our security incident," in which F5 "take[s] full ownership of" the incident and admitted: "***Our controls were uneven*** – strong in some places and ***not in others***."

206. F5's admissions after the Breach confirm that Defendants knew or were deliberately reckless in not knowing that F5's cybersecurity capabilities and protections fell materially short of the security-leader image Defendants projected to investors throughout the Class Period. Indeed, Defendants admitted that F5 had inadequate "automation in [its] inventory



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

and patch management," insufficient "monitoring for detection and response," deficient "zero-trust capabilities across [its] infrastructure and operations," and lacked "advanced endpoint visibility in F5 BIG-IP." At the same time Defendants were repeatedly assuring investors that the Company maintained "best-in-class" security infrastructure, F5 failed to follow basic cybersecurity protocols and had deficient controls. The Individual Defendants, as senior-most officers at a cybersecurity company who personally directed and approved F5's public representations about its security capabilities, either knew or were deliberately reckless in not knowing that the Company's actual cybersecurity posture fell materially short of its public representations.

207. The circumstances surrounding organizational changes at F5 in connection with the Security Breach further support an inference of scienter. As disclosed in the October 15, 2025 Form 8-K, Board member Michael Montoya resigned from F5's Board of Directors effective October 9, 2025, including from his memberships on the Risk Committee and the Nominating and ESG Committee. Montoya was then immediately appointed as F5's Chief Technology Operations Officer, a newly-created role reporting directly to CEO Locoh-Donou, where he would be tasked with leading "the enterprise-wide strategy and execution to build and operate the Company with security at its core." The rapid creation of an entirely new C-suite position devoted to security, filled by a former Risk Committee member, supports the inference that the Company's existing security infrastructure and governance as it existed during the Class Period were inadequate. These organizational changes were disclosed simultaneously with the Security Breach in the October 15, 2025 8-K, and the timing and nature of the changes reflect the Company's "top takeaway" from the incident that its security posture throughout the Class Period was deficient, and its controls were "uneven," with controls that were "not [strong]" in some areas, and required strengthening.

208. The intense reactions from governments, industry participants, securities analysts, the financial community, and the Company's own stock price further underscore the severity of



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

the Company's cybersecurity failings and is additional indicia of scienter. For example, Seeking Alpha wrote that the Breach was "the most important and damaging development," for the Company adding that "***The damage is lasting and structural, in my opinion, as this really hurt FFIV's reputation, which is literally (I consider) the most important attribute for a cybersecurity company***." Another Seeking Alpha article explained that the Breach was "***a major deal for a company whose products and services involve security***." CISA noted that the results of the Breach could be "catastrophic" and Tenable stated it was a "five-alarm fire for national security." Wolfe Research observed that F5 was "Stealing Defeat from the Jaws of Victory … F5's security breach is so disappointing" and Needham downgraded the Company's stock in light of the Breach and resulting business consequences.

### C. Defendants Knew About the Breach Before Disclosure and Chose to Make Affirmative Misrepresentations Rather Than Remain Silent

209. F5 has admitted that it first became aware of the breach no later than August 9, 2025. The Company did not publicly disclose the breach until October 15, 2025. The October 15 Form 8-K revealed that, on September 12, 2025, the DOJ determined pursuant to Item 1.05(c) that F5 could delay filing a Form 8-K disclosing the breach.

210. Importantly, DOJ and SEC commentary regarding the delay provision instructs that permission from the DOJ to delay disclosure is limited and does not protect against securities fraud. For example, the SEC noted:

> that the delay provision . . . does not relieve a company's obligations under Regulation FD or with respect to the securities laws' antifraud prohibitions that proscribe certain insider trading, including Exchange Act Section 10(b). Under Regulation FD, material nonpublic information disclosed to any investor, for example, through investor outreach activities, would be required to be disclosed publicly, subject to limited exceptions. *See* 17 CFR 243.100 *et seq.*" The SEC's commentary also stressed the importance of protecting investors, stating "'***Doubts as to the critical nature' of the relevant information should be 'resolved in favor of those the statute is designed to protect,' namely investors***." The SEC further cautioned against misleading investors, stating "We remind registrants, however, that they may



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

> have a duty to correct prior disclosure that the registrant determines was untrue (or omitted a material fact necessary to make the disclosure not misleading) at the time it was made (for example, if the registrant subsequently discovers contradictory information that existed at the time of the initial disclosure), or a duty to update disclosure that becomes materially inaccurate after it is made (for example, when the original statement is still being relied on by reasonable investors).

211. Indeed, the DOJ guidelines define the delay mechanism as specific to the *timing* of a single SEC form, not as a broader shield, stating "[t]hese departmental guidelines outline the process that companies . . . may use to request that the Attorney General authorize delays of cyber incident disclosures required by the U.S. Securities and Exchange Commission ('Commission') pursuant to Form 8-K Item 1.05." Guidelines from the DOJ further note the "document's limited scope," adding "***[t]hese guidelines do not attempt to describe every situation in which the law might require a cybersecurity disclosure, or when cybersecurity disclosures are advisable even if not required*** . . . . This document provides no legal advice about the meaning of Item 1.05, or about the nature or extent of the Commission's reporting requirements." The DOJ guidelines also state "These guidelines have no regulatory effect, confer no rights or remedies, and do not have the force of law. *See United States v. Caceres*, 440 U.S. 741 (1979)."

212. Yet, during the period between detection and disclosure, Defendants did not merely remain silent. Rather, they chose to appear at an investor conference and make affirmative, positive (but false) statements about F5's cybersecurity capabilities that they knew were false and materially misleading in light of the active, ongoing breach. On September 9, 2025, one month after F5 purportedly discovered the breach and three days before the DOJ granted the disclosure-delay request, Defendants Locoh-Donou and Werner appeared at the Goldman Sachs Communacopia & Technology Conference, where Locoh-Donou told investors that "[t]oday, application delivery and security have converged. You cannot really separate performance of an application from the application being secure. ***And that makes F5 absolutely critical to all application security***." Locoh-Donou further stated that F5 "control[s] 100% of the



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

traffic going into mission-critical applications," among other statements highlighting the Company's cybersecurity capabilities and prospects. *See* ¶¶149-152, above. These statements were made while Defendants knew that a nation-state threat actor had been operating inside F5's most critical product development environment for approximately two years and had exfiltrated source code and undisclosed vulnerability information. Defendants' decision to speak – and to do so in such expansive, affirmative terms – about the Company's security capabilities while concealing the existence of the breach is compelling evidence of scienter.

213. Notably, F5 did not cancel its appearance at the September Goldman Sachs conference after discovering the Breach. Instead, F5 chose to proceed and make positive but false statements about F5's industry leading security, omitting to disclose, among other things, that F5's cybersecurity protocols and controls were woefully deficient and ineffective.

214. Two days later, on September 11, 2025, in a press release also filed with the SEC on Form 8-K announcing F5's intent to acquire CalypsoAI, F5 stated it was the "global leader that delivers and secures every app. Backed by three decades of expertise, F5 has built the industry's premier platform – F5 Application Delivery and Security Platform (ADSP) – to deliver and secure every app, every API, anywhere: on-premises, in the cloud, at the edge, and across hybrid, multicloud environments."

215. These statements were made with knowledge of the ongoing nation-state intrusion and were plainly misleading. At no point during this period did Defendants disclose the breach, modify their security claims, or alert investors to the risks posed by the ongoing intrusion. An officer who chooses to speak about security capabilities to investors while knowing that the company's core systems are compromised acts with scienter.

### D. Defendants' Self-Proclaimed Expertise and Repeated Assurances Regarding F5's Security Capabilities

216. As described above in Section III, above, the Individual Defendants possess deep personal knowledge of and expertise in cybersecurity, with decades of experience at F5 and other cybersecurity companies. Furthermore, each of the Individual Defendants repeatedly highlighted



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

the Company's cybersecurity capabilities and the importance of those capabilities for the Company's financial prospects when speaking to investors, as described below.

217. Defendant Locoh-Donou, with a "27-year background in enterprise technology" spanning "the security, networking, and telecommunications industries," was credited with transforming F5 from a hardware-centric company into "a leader in Multi-Cloud Application Delivery and Security." Throughout the Class Period, Locoh-Donou repeatedly and confidently assured investors of F5's security capabilities. For example, On October 28, 2024, Defendant Locoh-Donou told investors "F5 over the last two decades, ***has really mastered the expertise of securing*** and delivering a ***critical network and application traffic***," adding "[w]e bring ***consistent industry-leading security***." On January 28, 2025, Locoh-Donou told investors that F5 "stand[s] alone with the only complete hybrid multi-cloud portfolio for application security and delivery," that "[w]e are the only player that can partner with a CIO or CISO to secure and deliver all of their applications and APIs across hybrid, multi-cloud environments," and that "F5 has the most effective and comprehensive application and API security platform in the industry." At the same earnings call, Locoh-Donou boasted that "the two decades of expertise that we have amassed in high-performance traffic management and security directly applies to the AI workloads and that ***no one brings that expertise to the table today or, frankly, in the foreseeable future***. So we are pretty confident about the differentiation in the technical solution." On April 28, 2025, Locoh-Donou stated "we happen to have the best technology in the industry to move data securely and at real speed for customers," and "We are delivering new capabilities that give CISOs the visibility, compliance, and protection they need to deliver and secure any app, any API, anywhere." On July 30, 2025, Locoh-Donou stated that "F5's unique ability to deliver and secure every app, every API anywhere, on premises, in the cloud, at the edge and across hybrid multi-cloud environments is a significant competitive advantage." And on September 9, 2025, Locoh-Donou told investors at the Goldman Sachs conference that "F5 has been in security now



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

for over a decade" and that "application delivery and security have converged," making "F5 absolutely critical to all application security."

218. Defendant Werner, with more than two decades of experience working at F5, told investors the Company knows "applications better than any company in the world" and emphasized that "security remains of paramount concern" to F5's customer base. At the December 10, 2024, Raymond James TMT Conference, Werner introduced F5 by explaining: "[W]e've built trust with our customers through best-in-class innovations and applications over the 25-year-plus history of our company, and we're recognized as the foremost experts in applications. And that really is our heritage, and it's our differentiation. We know applications better than any company in the world." Werner then emphasized that "security risks have really become much more sophisticated. And this situation has really become untenable for customers," positioning F5 as the solution to these challenges by "ensuring that they get the value expected from their apps without sacrificing the user experience or the security of these applications." Werner further stated that F5 was "really kind of at the top end of security use cases and efficiency initiatives." At the November 2024 RBC conference, Werner declared that "[s]ecurity remains of paramount concern, especially in the federal government" and that "security will continue to be a big driver of demand" for F5's products.

219. Defendant Anand served as both CTO and CISO at Imperva before joining F5. The Company touted Anand's hire by stating he "joins the company with deep expertise across multiple areas, including cybersecurity and data." Defendant Locoh-Donou personally endorsed Anand's credentials, stating that "Kunal had both the experience and perspective required for the role" and that "[t]hrough his prior experience leading the technical and security teams at Imperva, Kunal brings deep domain expertise and technical knowledge across cloud, security, networking, SaaS and AI." At the November 20, 2024 RBC conference, Anand told investors that "the nation state attacks that are happening" target "some of the biggest companies in the world," and that "the software supply chain . . . can [not] be underestimated" as a threat vector, adding that



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

cybersecurity risk is "still issue number one for a lot of CIOs." When asked whether F5 could compete as a "first-party provider from a cyber perspective" against companies like Zscaler and Palo Alto, Anand responded that F5 had been rated "by IDC in their market cap as the leader in web applicant" protection, stating that was "a testament to the fact that we've been either acquiring or bringing in the right pieces or developing the right technology" regarding security. At the May 2025 JPMorgan conference, Anand emphasized that F5's strategy of "bridging both delivery and security together" was a "core differentiator," stating: "We really believe that the infusion of security and delivery is fundamentally important."

220. Defendant Fountain, with prior executive roles at McAfee, Intel, and Juniper Networks, stated that F5 has "a very complete offering that's highly differentiated" and that he felt "very good about the security efficacy of the products that we have." At the November 19, 2024, Needham Security, Networking, and Communications Conference, Fountain told investors that F5 had built "a single holistic best-in-class approach" to API security, stating: "[W]e feel very good about the completeness of our offering here. No one else is able to deliver this same range what we call shift left and shield right." Fountain added that customers are "increasingly looking for vendors that are able to bring all four of these technologies together. So web application firewall, anti-bot, distributed denial of service and API security, all into one complete offering. We have a very complete offering that's highly differentiated in those areas." At the June 4, 2025 Bank of America conference, Fountain further stated that "security is really the lead proposition in engaging with customers" and that F5 had "a very rich history of capabilities around application security and delivery," adding that the platform would "help drive a significant improvement in security efficacy. And so you can secure your environment better." When asked about the competitive landscape at the same conference, Fountain stated: "I think we feel very good about the security efficacy of the products that we have in each of those segments. So we go toe-to-toe with them" and that "there's nobody who is able to operate across all these different deployment models. And so I think we're quite unique."



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

221. These were not passive, boilerplate disclosures. Defendants made specific, affirmative representations about F5's security capabilities in response to analyst questions, in prepared earnings remarks, in SEC filings, and in investor presentations. They told investors that F5 was the "only player" that could comprehensively secure applications across hybrid multi-cloud environments; that F5's platform offered "best-in-class capabilities"; and that "no one brings that expertise to the table today or, frankly, in the foreseeable future." These representations were made with frequency and specificity as the long-term persistent security breach was ongoing. That Defendants held themselves out as cybersecurity experts and made such detailed, affirmative representations about the subjects within their purported expertise is indicative of scienter, especially when considering the Company's severe and longstanding security failures.

222. Furthermore, Defendants Locoh-Donou and Werner signed SOX Section 302 and Section 906 certifications during the Class Period attesting to the accuracy of F5's financial statements (which included representations regarding cybersecurity) and the adequacy of the Company's internal controls.

**E. The Breach was Worse than Represented**

223. The true severity of the Security Breach was materially worse than F5's public disclosures acknowledged, further supporting the inference that Defendants were concealing material information from investors. For example, the Deep Specter Report stated that "F5 Is Misleading the Market – The Breach Is Nowhere Near Contained," asserting that "F5 is misleading its clients, investors, and regulators by selling a story of containment that doesn't exist." *See* ¶¶181-185, above.

224. Subsequent events provide additional support that F5 understated the severity of the vulnerabilities disclosed in connection with the breach. On March 27, 2026, the severity of the Security Breach was upgraded as F5 reclassified CVE-2025-53521 from a high-severity denial-of-service flaw (CVSS 7.5) to a ***critical-severity*** remote code execution vulnerability



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

(CVSS 9.8). CISA issued an alert stating "[t]his type of vulnerability is a frequent attack vector for malicious cyber actors and poses significant risks to the federal enterprise." The Dutch National Cyber Security Center and industry participants confirmed that the vulnerability had been actively exploited. Hackread stated that the vulnerability went "***From Minor Glitch to Major Threat***." A cybersecurity executive described the reclassification as "cybersecurity roulette," stating: "F5 just reclassified what was supposed to be a DoS bug into a full-blown RCE."

225. This reclassification raises additional questions about the completeness of F5's assessment of the breach and disclosures to investors, as the true scope of the threat was greater than Defendants represented in October 2025.

226. F5's statement that "containment efforts have been successful" is in tension with the fact that the Azure-hosted Artifactory remained publicly reachable for 184 days after the October 15, 2025, disclosure. External scanning indicates that the system continued to respond to network requests throughout this period. This is indicative of ongoing public exposure.

227. Further underscoring the inadequacy of F5's response to the incident, a TLS certificate used across F5's Artifactory system on Microsoft Azure expired on December 15, 2025 and was still in use on December 19, 2025. An expired TLS certificate undermines the security functions that TLS certificates are designed to provide and can cause secure connections to fail. That F5 allowed a security certificate to lapse on infrastructure at issue in a nation-state breach is additional evidence demonstrating the severity of F5's cybersecurity failures.

228. After the Breach, F5 stood up a parallel development environment on a new domain under a different public certificate authority and in a separate Microsoft tenant. The new environment included parallel source-code systems, Artifactory repositories, among other components of F5's core development pipeline used to build and release software, including BIG-IP.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

229. The scope of this rebuild is difficult to reconcile with F5's public characterization of the Breach. F5 represented to investors that there was "no evidence of modification to our software supply chain, including our source code and our build and release pipelines." If that characterization were accurate, remediation would typically involve hardening the existing systems, such as patching vulnerabilities, rotating credentials, and tightening access controls. Instead, F5 built a new parallel infrastructure that the Company ran alongside the legacy environment, which remained on public internet addresses until April 2026. This is the digital equivalent of constructing a new factory next door while the old one remains open to the public. Such behavior is consistent with a significant rebuild prompted by integrity concerns, not mere hardening. The decision to rebuild rather than remediate supports the reasonable inference that F5's internal assessment of the compromise was far more severe than what was publicly communicated and that the integrity of the build environment could not be assured, necessitating a fresh start.

230. The Breach also triggered customer-facing consequences. After public disclosure, F5's customers reached out to the Company to request due diligence regarding the incident, requested indicators of compromise, and, where F5 had contractual commitments, custom audits. Customers then had to decide how to proceed as customers of F5, including whether the incident constituted a breach of contract that could support an early exit from their relationship with the Company.

**F. Defendants Were on Notice of Repeated Nation-State Targeting of BIG-IP**

231. Prior to and throughout the Class Period, BIG-IP was a known and recurring target of nation-state threat actors. As discussed above, in late 2023, a critical authentication-bypass vulnerability in BIG-IP's Traffic Management User Interface (CVE-2023-46747) was exploited in the wild by UNC5174, a China-nexus threat actor, to create backdoor administrator accounts on BIG-IP devices. In mid-2024, security researchers at Eclypsium publicly disclosed two high-severity vulnerabilities in BIG-IP Next Central Manager (CVE-2024-21793 and CVE-2024-



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

26026) that could allow attackers to gain full administrative control of devices and create hidden accounts. The suspected Chinese state-sponsored group "Velvet Ant" used custom malware to maintain persistent access on outdated BIG-IP equipment for as long as three years. In mid-2025, the China-nexus group "Fire Ant" exploited flaws concerning VMware and F5. F5 software flaws were also the subject of a 2023 CISA alert, during which China-linked hackers exploited one of those vulnerabilities. *See* ¶64 above.

232. This established pattern of Chinese state-sponsored targeting of F5 products was well known to Defendants. Defendant Anand himself told investors in November 2024 that "cybersecurity is one of the most important" issues and specifically referenced "the nation state attacks that are happening" against "critical infrastructure as well as some of the biggest companies in the world" and warned about "the software supply chain" being "underestimated." Defendant Anand's own words demonstrate that F5 executives were aware of the very type of threat that had already compromised F5's systems. Given this well-documented history of BIG-IP targeting, the Individual Defendants were reckless in making strong, affirmative representations about F5's security capabilities while its controls were deficient.

**G. The Company's Internally Deficient Security Culture**

233. F5's internal conduct after the Breach raises questions about the priority F5 placed on security. For example, as part of F5's product-release process, the Company used a release checklist that included vulnerability scanning to identify critical or high vulnerabilities before release. When such vulnerabilities were identified, they were flagged to the development team for potential remediation. If vulnerabilities could not be resolved before release, F5's process allowed a "risk exemption" to be submitted to the governance and compliance team, which would review the vulnerability for its risks to customers and impact on the business, rate the risk, and, if the risk reached a certain level, report it to CISO Chris Burger. Burger could then escalate the risk write-up to the product line or to Defendant Anand, depending on the vulnerability.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

234. Despite this process, F5 released at least one product with known critical vulnerabilities even though a patch was available to remediate those vulnerabilities before release to customers. F5 declined to apply the available patch, which would not have caused regression in the product. The product was released despite known vulnerabilities and without the patch. At least one employee that escalated the issue to the CISO and tried to sound the alarm with senior management and was reprimanded. The employee was told F5 could not delay the release and that the employee should not have escalated the issue. F5 personnel were instructed to get the product out the door despite major issues and vulnerabilities. The product at issue was a release of BIG-IP.

235. F5's conduct after the October 2025 disclosure signals that the Company did not take the Breach seriously. Despite publicly disclosing a potentially catastrophic nation-state attack, F5 did not meaningfully change certain important practices concerning security. The product release with major issues and vulnerabilities described above occurred after the Breach was already public. The lack of meaningful improvement after the Breach signals that from a C-Suite perspective, the Company was willing to accept the consequences of its pre-Breach security posture.

## IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

236. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. To the extent certain statements alleged to be false or misleading are determined to be mixed statements of historical or present information and future information, such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

237. Defendants are also liable for any alleged false or misleading forward-looking statements because, at the time each forward-looking statement was made, the speaker had actual



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of F5 who knew that the forward-looking statement was false. None of the historic or present tense statements Defendants made was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as it was not stated to be such assumption underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts Defendants made expressly related to or stated to be dependent on those historic or present tense statements when made.

## X. PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

238. Lead Plaintiffs and the Class are entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine. At all times during the Class Period, the market for F5 common stock was efficient for the following reasons, among others:

(a) F5 common stock met the listing requirements, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) According to the Company's Form 10-K for the fiscal year ended September 30, 2025, F5 had over 58 million shares outstanding as of November 12, 2025;

(c) As a regulated issuer, F5 filed periodic public reports with the SEC;

(d) F5 regularly and publicly communicated with investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services and through other wide-ranging public disclosures, such as through the internet and communications with the financial press and other similar reporting services;

(e) F5 was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

(f) Unexpected material news about F5 was rapidly reflected in and incorporated into prices for the Company's shares during the Class Period.

239. As a result of the foregoing, the market for F5 common stock promptly digested current information regarding F5 from all publicly available sources and reflected such information in the price of F5 common stock. Under these circumstances, all purchasers of F5 common stock during the Class Period suffered similar injury through their purchase of F5 common stock at artificially inflated prices and the presumption of reliance applies. The material misstatements and omissions alleged herein would induce a reasonable investor to misjudge the value of F5 stock, and without knowledge of the misrepresented or omitted material facts, Lead Plaintiffs and other members of the Class purchased or acquired F5 stock between the time Defendants misrepresented and/or failed to disclose material facts about the Company's cybersecurity capabilities and the Security Breach, at the time the true facts were disclosed. Accordingly, Lead Plaintiffs and other members of the Class relied, and are entitled to have relied, upon the integrity of the market for F5 common stock and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

240. Lead Plaintiffs and the Class are also entitled to a presumption of reliance under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon, in significant part, omissions of material fact for which there was a duty to disclose.

## XI. LOSS CAUSATION / ECONOMIC LOSS

241. The fraud alleged herein was the proximate cause of the economic loss suffered by Plaintiffs and the Class. There was "a causal connection between the material misrepresentation and the loss" (i.e., stock price declines), as described herein. *See, e.g., Dura*



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

*Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). The truth was revealed by a series of partial disclosures through which the truth gradually leaked out. *Dura*, 544 U.S. at 342.

242. During the Class Period, Lead Plaintiffs and other Class members purchased or otherwise acquired F5 common stock at artificially inflated prices, and were damaged thereby when the price of F5 common stock declined in response to the partial disclosures. Throughout the Class Period, the price of F5 common stock was artificially inflated and/or maintained as a result of Defendants' materially false and misleading statements and omissions. The price of F5 common stock significantly declined, causing investors to suffer losses, in response to a series of partial disclosures concerning or connected to the facts misrepresented or concealed by Defendants, which are described more fully above in Section V.

243. Furthermore, Defendants' false and misleading statements served to conceal the risks created by the Company's deficient cybersecurity controls. It was foreseeable that these undisclosed structural problems would lead to a major security incident and negative financial consequences for F5. The materialization of these risks would obviously lead to a significant decline in the price of F5 stock.

244. As a result of the disclosures described herein on October 15 and 16, 2025 and October 27, 2025, F5 common stock declined $79.47 per share, or 23%. Each of these disclosures was associated with a statistically significant "abnormal" decline, meaning they were not explained by broader market or industry price declines. As a result of their purchases of F5 common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

245. The below chart summarizes Defendants' disclosures and the impact of such disclosures on F5's stock price:



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

| Date | Corrective Disclosure | Prior Day Closing Price | Closing Stock Price | Price Change | Percent Change |
|---|---|---|---|---|---|
| Oct. 15-16, 2025 | Disclosure of the long-term, persistent nation-state breach of BIG-IP, exfiltration of source code and undisclosed vulnerabilities, the Montoya transition to Chief Technology Operations Officer. | $343.17 | $295.35 | ($47.82) | (13.9%) |
| Oct. 27, 2025 | Q4 FY25 earnings release reducing FY26 revenue growth guidance to 0%–4%, Q1 FY26 revenue and EPS guidance well below consensus and Defendants' disclosure of three categories of breach-driven harm. | $290.41 | $258.76 | ($31.65) | (10.9%) |

## XII. CLASS ACTION ALLEGATIONS

246. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased or otherwise acquired the publicly-traded common stock of F5 during the period between October 28, 2024 and October 27, 2025, inclusive. Excluded from the Class are (i) Defendants and members of their families, (ii) any person who was an officer, director, or control person of F5 during the Class Period, (iii) any trust, corporation, or other entity in which any Defendant has or had a controlling interest; (iv) F5's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (v) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

247. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, F5 common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are thousands of members in the proposed Class. Millions of F5 shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

identified from records maintained by F5 or its transfer agent(s) and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

248. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(i) Whether the federal securities laws were violated by Defendants' acts, omissions, and common scheme to defraud as alleged herein;

(ii) Whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted material facts.

(iii) Whether, and to what extent, the market price of F5 common stock was artificially inflated during the Class Period because of the material misstatements alleged herein.

(iv) Whether Defendants acted with the requisite level of scienter; and

(v) Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

249. Lead Plaintiffs' claims are typical of those of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

250. Lead Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel who are experienced in securities and class action litigation.

251. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for all members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

**COUNT I**
**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**(Against All Defendants)**

252. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is asserted on behalf of all members of the Class against all Defendants for violations of §10(b) of the Exchange Act (15 U.S.C. §78j(b)), and Rule 10b-5 promulgated by the SEC thereunder (17 C.F.R. §240.10b-5).

253. During the Class Period, F5, through its officers, management, and agents, including Defendants Locoh-Donou, Werner, Anand, and Fountain made, disseminated, approved, or were responsible for the statements specified in §V, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

254. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of F5 common stock during the Class Period.

255. Defendants and the Company's officers, management, and agents, directly and indirectly, violated §10(b) of the Exchange Act and Rule 10b-5 in that they, by the use of means and instrumentalities of interstate commerce, the mail, and/or the facilities of a national securities exchange:

(d) employed devices, schemes, and artifices to defraud;



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

(e) made misleading statements and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(f) engaged in acts, practices, and a course of business that operated as fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of F5 common stock during the Class Period.

256. All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and as controlling persons as alleged below.

257. Defendants and the Company's officers, management, and agents did not have a reasonable basis for their alleged false statements and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of F5 common stock during the Class Period.

258. F5 is liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, including the false and misleading statements made by the Company's officers and agents, as alleged above, as the maker of such statements and under the principle of *respondeat superior*.

259. Defendants and the Company's officers, management, and agents, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse material information about the true nature of F5's cybersecurity capabilities and the Security Breach.

260. The allegations above establish a strong inference that F5, as an entity, acted with corporate scienter throughout the Class Period, as its officers and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

concealing the truth about F5's cybersecurity capabilities and the Security Breach. By concealing these material facts from investors, F5's share price was artificially inflated during the Class Period.

261. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth about F5's cybersecurity capabilities and the Security Breach, thus artificially inflating the price of F5's common stock.

262. Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for F5 common stock. Lead Plaintiffs and the Class would not have purchased F5 common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and omissions.

263. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of F5 common stock during the Class Period.

## COUNT II
## For Violation of §20(a) of the Exchange Act
## (Against the Individual Defendants)

264. Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

265. This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of §20(a) of the Exchange Act. 15 U.S.C. §78t(a). During their tenures as officers and/or directors of F5, Defendants Locoh-Donou, Werner, Anand, and Fountain acted as controlling persons of the Company within the meaning of §20(a) of the Exchange Act. By reason of their positions with the Company, the Individual Defendants had the power and



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

authority to cause the Company to engage in the wrongful conduct complained of herein. The Company controlled the Individual Defendants and all of its employees. Accordingly, Defendants are liable pursuant to §20(a) of the Exchange Act.

266. By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's cybersecurity capabilities and Security Breach, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance as well as their power to control public statements about F5, Defendants Locoh-Donou, Werner, Anand, and Fountain had the power and ability to influence and control, directly or indirectly, the Company's decision-making, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading. Defendants Locoh-Donou, Werner, Anand, and Fountain participated in interviews and conference calls with investors and analysts, and/or prepared and approved the Company's public statements, SEC filings, and press releases, described herein at §V, alleged by Lead Plaintiffs to be misleading.

267. In particular, the Individual Defendants had direct and supervisory involvement in the Company's day-to-day operations and, therefore, are presumed to have had the power to control or influence the particular conduct, statements, and omissions giving rise to the securities violations as alleged herein and exercised the same. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

268. As set forth above, Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of F5 common stock during the Class Period.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

A. Determining that this action is a proper class action, certifying Lead Plaintiffs as Class representatives and Lead Plaintiffs' counsel as Class Counsel under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable, injunctive, or other and further relief as the Court may deem just and proper.

## XIV. JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED: this 20th day of May, 2026

**TOUSLEY BRAIN STEPHENS PLLC**

By: *_/s/ Kim D. Stephens, P.S._*
By: *_/s/ Rebecca L. Solomon_*
Kim D. Stephens, P.S., WSBA #11984
Rebecca L. Solomon, WSBA #51520
1200 Fifth Avenue, Suite 1700
Seattle, WA 98101
Tel.: (206) 682-5600
kstephens@tousley.com
rsolomon@tousley.com

*Local Counsel*

**DICELLO LEVITT LLP**

By: *_/s/ Henry Rosen_*
By: *_/s/ Brian O. O'Mara_*
By: *_/s/ Hani Y. Farah_*
Henry Rosen (admitted *pro hac vice*)
Brian O. O'Mara (admitted *pro hac vice*)
Hani Y. Farah (admitted *pro hac vice*)
4747 Executive Drive, Suite 240
San Diego, CA 92121
Tel.: (619) 923-3939

hrosen@dicellolevitt.com
briano@dicellolevitt.com
hfarah@dicellolevitt.com

By: */s/ Jarett N. Sena*
Jarett N. Sena (*pro hac vice* forthcoming)
DICELLO LEVITT LLP
485 Lexington Avenue, Suite 1001
New York, NY 10017
Tel.: (646) 933-1000
jsena@dicellolevitt.com

**DiCELLO LEVITT LLP**

By: */s/ Roxana Pierce*
Roxana Pierce (admitted *pro hac vice*)
801 17th St. NW, Suite 430
Washington, DC 20006
Tel.: (202) 975-2288
rpierce@dicellolevitt.com

*Lead Counsel for Lead Plaintiffs*